**USINOR SACILOR, Unimetal, and Ascometal, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Inland Steel Bar Company, Defendant–Intervenor.**

Slip Op. 95–94.
Court No. 93–04–00230.

United States Court of International Trade.

May 19, 1995.

---

Weil, Gotshal & Manges, Washington, DC (M. Jean Anderson, Jeffrey P. Bialos, Stuart M. Rosen, A. Paul Victor, Mark B. Friedman, Diane M. McDevitt, Jonathan Bloom, and Scott Maberry), for Usinor Sacilor, Unimetal, and Ascometal, plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Jeffrey M. Telep); Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce (Terrence J. McCartin), Washington, DC, of counsel, for defendant.

Wiley, Rein & Fielding, Washington, DC (Charles Owen Verrill, Jr., Alan H. Price, Peter S. Jordan, and Jacqueline A. Jones), for Inland Steel Bar Co., defendant-intervenor.

### MEMORANDUM and OPINION

GOLDBERG, Judge:

Usinor Sacilor, Unimetal and Ascometal ("Usinor Sacilor" or "Usinor"), and Inland Steel Bar Company ("Inland Steel"), bring this consolidated action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (1988) to contest the final determination by the International Trade Administration, U.S. Department of Commerce ("ITA" or "Commerce"), in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France*, 58 Fed.Reg. 6221 (Jan. 27, 1993) (*"Final Determination"*). In this consolidated action, Usinor Sacilor and Inland Steel each seek judgment upon the agency record pursuant to USCIT Rule 56.2. The court exercises its jurisdiction under 28 U.S.C. § 1581(c) (1988).

### I. BACKGROUND

A. *Subject Matter of Commerce's Investigation.*

In general terms, Commerce's investigation in this case addressed various facets of a restructuring program undertaken by the government of France ("GOF") beginning in the late 1970s to bolster France's steel industry and, specifically, Usinor Sacilor and its predecessors, Usinor and Sacilor.[1] The period of investigation ("POI") is calendar year 1991. *Final Determination*, 58 Fed.Reg. at 6222.

Seven components of the restructuring program are at issue in this case. These components are as follows: (1) "prêts à caractéristiques spéciales" ("PACS") or "loans with special characteristics" received by Usinor and Sacilor; (2) "Fonds d'Intervention Sidérurgique" ("FIS") or the "Steel Inter-

---

1. Usinor and Sacilor, both state-owned companies, merged at the end of 1987 to form Usinor Sacilor. *See Certain Hot Rolled Lead and Bismuth Carbon Steel Products From France*, 57 Fed.Reg. 42,977, 42,978 (Sept. 17, 1992) (*"Preliminary Determination"*).

vention Fund" through which Usinor and Sacilor were able to issue bonds guaranteed by the GOF to the public; (3) the GOF's practice between 1982 and 1986 of making shareholder advances to Usinor and Sacilor to finance revenue shortfalls; (4) the conversion of Usinor's and Sacilor's PACS and FIS instruments and shareholder advances to common stock; (5) the 1990 consolidation of loans that Usinor and Sacilor received through the GOF's "Fonds de Développment Economique et Social" ("FDES"); (6) the 1991 consolidation of loans that Usinor and Sacilor received through the GOF's "Caisse Francaise de Développement Industriel" ("CFDI"); and (7) the 1991 consolidation by Crédit National, a financial institution controlled by the GOF, of outstanding loans held by Usinor Sacilor. *See id.* at 6224–27. After investigating these aspects of the GOF's restructuring program and others not pertinent to this action, Commerce determined that Usinor Sacilor received countervailable benefits totalling 23.11 percent *ad valorem.*[2] For purposes of clarity, the court will set forth the relevant details of each facet of the GOF's program under review in this case.

B. *Components of the GOF's Restructuring Program.*

1. *PACS Instruments:*

The first aspect of the GOF's plan relevant to this case is the PACS instrument system. This system allowed Usinor and Sacilor "to reconstitute equity through the conversion of debt into PACS." *Public Record Document Number ("Pub. Doc.") 107, Confidential Record Document Number ("Confid. Doc.") 19* at 5. Such conversion enabled the companies to exchange their former obligations on loans and bonds for new obligations based on the PACS. *See Final Determination,* 58 Fed. Reg. at 6224. The responses that Commerce received during the investigation indicated that the PACS instruments were "akin to redeemable subordinated nonvoting preferred stock." *Id.* The responses also showed that the PACS instruments

had the following characteristics: (1) a 0.10 percent remuneration for the first five years and 1.0 percent thereafter, (2) no schedule of reimbursement but in the event the steel companies became profitable, the PACS holders could elect to redeem their PACS or share in profits according to a predetermined formula, and (3) PACS were subordinated to all but the common stock.

*Final Determination,* 58 Fed.Reg. at 6224. The responses further revealed that Usinor and Sacilor accounted for the PACS instruments as shareholders' equity on their balance sheets. *Id.*

Between 1978 and 1991, Usinor Sacilor and its predecessors used the PACS program to refinance debt on several occasions. Specifically, "[i]n 1978, Usinor and Sacilor converted 21.1 billion French francs (FF) of debt into PACS. From 1980 to 1981, Usinor and Sacilor issued FF8.1 billion of new PACS." *Id.* The companies subsequently converted "PACS in the amount of FF13.8 billion, FF12.6 billion and FF2.8 billion ... into common stock in 1981, 1986 and 1991, respectively." *Id.*

Commerce's treatment of the PACS conversions depended upon Usinor Sacilor's equityworthiness at the time of the conversions. The rationale for this treatment stems from the ITA's conclusion that "any benefits to Usinor Sacilor occurred at the point when these instruments were converted to common stock." *Id.* Commerce found Usinor Sacilor to be unequityworthy from 1981 through 1988 and therefore "consider[ed] the conversion of PACS to common stock in 1981 and 1986 to constitute equity infusions on terms inconsistent with commercial considerations." *Id.* In contrast to the 1981 and 1986 conversions, Commerce determined that "the PACS to equity conversion in 1991 was consistent with commercial considerations" because Usinor Sacilor was equityworthy by that time. *Id.*

---

**2.** In the *Final Determination,* Commerce established a subsidy rate for Usinor Sacilor of 23.14 percent *ad valorem. Final Determination,* 58 Fed.Reg. at 6232. The ITA subsequently amended the rate to 23.11 percent *ad valorem. Certain*

*Hot Rolled Lead and Bismuth Carbon Steel Products From France,* 58 Fed.Reg. 15,326, 15,327 (Mar. 22, 1993) (CVD order and amendment of final affirmative countervailing duty determination).

### 2. FIS Instruments:

The second GOF program at issue is the "Fonds d'Intervention Sidérurgique" ("FIS"), or Steel Intervention Fund, created by the GOF in 1983. The FIS, in conjunction with the 1981 Corrected Finance Law, allowed Usinor and Sacilor to issue convertible bonds. The companies "issued convertible bonds to the FIS, which, in turn, with the GOF guarantee, floated bonds to the public and to institutional investors." *Final Determination*, 58 Fed.Reg. at 6224.

Similar to the PACS, the FIS instruments carried "a nominal 0.1% rate of return and a profit-sharing component." *Plaintiffs' Brief* at 3. The bonds also "established a fixed schedule of fifteen annual principal repayments, with the GOF agreeing to make the first one or two of the ... repayments and the issuing company being obligated to make the remaining ... repayments." *Defendant's Brief* at 10 (footnote omitted). "In 1983, 1984, and 1985, Usinor and Sacilor issued convertible bonds to the FIS. These FIS bonds were converted to common stock in 1986 and 1988." *Final Determination*, 58 Fed.Reg. at 6224. Based upon its unequityworthiness findings for the years 1981 through 1988, Commerce "consider[ed] the conversion of FIS bonds to common stock in 1986 and 1988 to constitute equity infusions on terms inconsistent with commercial considerations." *Id.*

### 3. Shareholder Advances:

The third pertinent component of the GOF's restructuring plan is the GOF's practice of making shareholder advances to Usinor and Sacilor to finance revenue shortfalls. This practice, which began in 1982, enabled the companies to receive interest free cash infusions upon request. *Final Determination*, 58 Fed.Reg. at 6224; *see also Plaintiffs' Brief* at 3. "These shareholders' advances carried no interest and there was no precondition for receipt of these funds." *Final Determination*, 58 Fed.Reg. at 6224. The GOF ended the practice in 1986 at which time the companies converted the amount of funds received through the advances to common stock. *Id.* In its *Final Determination*, Commerce determined that "shareholders'" advances constitute countervailable grants at the time they were received as no shares were distributed in return for these advances when they were made to Usinor and Sacilor." *Id.* at 6225.

### 4. FDES and CFDI Loans:

The fourth element of the GOF's plan relevant to this action is the loan program established by the Law of July 13, 1978. *Final Determination*, 58 Fed.Reg. at 6225. This law "created participative loans ... which were by law available to all French companies. Under these loans, which were issued by the FDES and the [CFDI], the borrower paid a lower-than-market interest rate plus a share of future profits according to an agreed upon formula." *Id.* According to Commerce, "[t]hese loans were obtained by either Usinor, Sacilor, or their subsidiaries." *Id.* In 1990 and 1991, Usinor Sacilor consolidated the outstanding principal on its predecessors' FDES and CFDI loans, respectively. *Id.* Commerce determined that both the FDES and CFDI consolidated loans were new loans. *Id.*

With respect to the FDES consolidated loans, Commerce determined that they are *de facto* limited because the GOF provided insufficient information regarding the loans' specificity. *Id.* Consequently, Commerce that concluded the FDES loans "are countervailable to the extent that they were provided on terms more favorable than the benchmark financing."

Unlike the FDES consolidation, Commerce determined that the 1991 CFDI consolidation did not provide any countervailable benefits during the period of investigation; however, the ITA also concluded that the original CFDI loans did confer such benefits. *Final Determination*, 58 Fed.Reg. at 6225. Commerce based its determination regarding the 1991 consolidated CFDI loans on the fact that Usinor Sacilor would not pay any interest on the loans until 1992 and, therefore, the new loans would not have any cash flow effect until after the period of investigation. *Id.* In contrast, the ITA determined that the old CFDI loans, which were still outstanding during a portion of the period of investigation, conferred countervailable benefits dur-

ing the POI. *Id.* Commerce based this determination on its finding that the evidence adduced by Usinor Sacilor did not demonstrate that the old CFDI loans were nonspecific. *Id.* As a result, the ITA concluded that the old CFDI loans are *de facto* limited and are countervailable to the extent they were provided on terms inconsistent with commercial considerations. *Id.*

### 5. *Consolidation of Crédit National Loans:*

In 1991, Crédit National consolidated numerous loans that it had made to Usinor Sacilor. *Final Determination,* 58 Fed.Reg. at 6226. Similar to its determination regarding the consolidation of Usinor Sacilor's outstanding FDES loans, Commerce determined that the consolidated Crédit National loans constituted new loans because they had new terms and conditions. *Id.* In contrast to the FDES consolidated loans, however, Commerce determined that the Crédit National consolidated loans were not countervailable because they "were not provided to a specific enterprise or industry or group of enterprises or industries." *Id.* at 6227.

## II. *DISCUSSION*

Usinor challenges Commerce's *Final Determination* on eight separate grounds. Specifically, Usinor contests Commerce's determinations that: (1) the PACS and FIS instruments received by Usinor and Sacilor were debt upon issuance; (2) Usinor Sacilor and its predecessors were not equityworthy in 1986 and 1988; (3) the countervailable benefits inuring to Usinor Sacilor and its predecessors as a result of the conversion of PACS and FIS instruments to common stock equalled the face value of the remaining principal on the instruments; (4) shareholder advances made by the GOF to Usinor and Sacilor were non-recurring grants; (5) Usinor Sacilor's consolidated FDES loans, as well as its outstanding CFDI loans, conferred countervailable benefits upon the company; (6) the benchmark discount and interest rate in the years in which Usinor Sacilor was uncreditworthy is the IMF's long-term rate for France; (7) the amortization period for the non-recurring grants and equity infu-

sions that Usinor Sacilor received is 15 years; and (8) the sales denominator used in computing Usinor Sacilor's net subsidy must exclude sales of the company's non-French produced merchandise. Defendant and Inland Steel oppose each of plaintiffs' contentions.

Inland Steel contests three aspects of Commerce's *Final Determination.* Specifically, Inland Steel challenges Commerce's determinations that: (1) Usinor Sacilor was equityworthy in 1991; (2) shareholder advances made by the GOF to Usinor and Sacilor were grants; and (3) no countervailable benefit inured to Usinor Sacilor in 1991 when Credit National consolidated the company's outstanding loans. Defendant and Usinor Sacilor oppose each of the challenges raised by Inland Steel to the *Final Determination.*

 In reviewing a determination made by Commerce, this court must decide whether the determination is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987). This court must also accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). "An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.'" *ICC Indus., Inc. v. United States,* 5 Fed. Cir. (T) 78, 85, 812 F.2d 694, 699 (1987) (citation omitted). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). The agency must not, however, "contravene or ignore the intent of the legislature or the guiding purpose

of the statute." *Ceramica Regiomontana*, 10 CIT at 405, 636 F.Supp. at 966 (citations omitted). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence on the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Id.,* 636 F.Supp. at 966 (citations omitted).

## A. *Usinor Sacilor v. United States.*

### 1. *Characterization of PACS and FIS Instruments Upon Issuance:*

■ The first issue before the court is whether Commerce's determination that the PACS and FIS instruments were debt upon issuance is supported by substantial evidence on the record and is otherwise in accordance with law. With respect to the PACS instruments, questionnaire responses received by Commerce indicated that the instruments

> had the following characteristics: (1) a 0.10 percent remuneration for the first five years and 1.0 percent thereafter, (2) no schedule of reimbursement but in the event the steel companies became profitable, the PACS holders could elect to redeem their PACS or share in profits according to a predetermined formula....

*Final Determination,* 58 Fed.Reg. at 6224. The FIS instruments similarly carried a 0.10 percent rate of return and a profit-sharing component. *Pub. Doc. 55, Confid. Doc. 3,* Exs. 20A, 20B. In addition, the FIS instruments established a fixed schedule of fifteen annual principal repayments, with the GOF agreeing to make the first one or two of the repayments and the issuing company being obligated to make the remaining repayments. *Defendant's Brief* at 10; *see also Pub. Doc. 55, Confid. Doc. 3,* Exs. 20A, 20B.

Commerce determined that the PACS and FIS instruments were debt because they both carried repayment obligations. *Final Determination,* 58 Fed.Reg. at 6228. The ITA emphasized the fact that these obligations terminated only when the GOF and the companies converted the instruments into common stock. *Id.* Commerce noted that the instruments produced a cash flow effect while they remained outstanding insofar as they allowed the companies to pay reduced interest rates for the use of the funds. *Id.* The ITA further reasoned that upon conversion of the instruments to common stock, the cash flow effect was that of a grant. *Id.* As the methodology that Commerce employed in this investigation treats equity investments in unequityworthy companies like grants, and the ITA found Usinor Sacilor and its predecessors to be unequityworthy when the 1981, 1986 and 1988 instruments-to-stock conversions occurred, the ITA determined that these conversions constituted countervailable grants. *Id.* at 6223, 6227–28; *see also* 19 U.S.C. § 1677(5)(A)(ii)(III) (1988) ("The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry" constitutes a subsidy if provided "by government action to a specific enterprise or industry, or group of enterprises or industries....").

Usinor opposes Commerce's characterization of the instruments as debt and maintains that Commerce should have concluded that the instruments were equity upon issuance. Usinor emphasizes the fact that the PACS "were subordinated to all other secured and unsecured credit of the Company, ... had no fixed repayment schedule or maturity date[,] ... [and] contained no unconditional repayment obligation—only a potential for an unlimited supplemental return and/or repayment of the face value of the PACS out of the Company's profits." *Plaintiffs' Brief* at 3 (emphasis omitted).

As for the FIS instruments, Usinor claims they represent "a permanent commitment of funds by the GOF to Usinor Sacilor." *Id.* at 16. Usinor notes that although the FIS agreements did contain nominal repayment schedules, the GOF agreed to meet the schedules until [ ]. *See Plaintiffs' Brief* at 16–17. Usinor adds that "the nominal amortization schedules for the FIS instruments did not in fact create any real obligation of repayment" because "any repayment was tied to the uncertain prospect of improved future performance." *Plaintiffs' Reply Brief* at 4 (emphasis omitted). In sum, Usinor asserts that the GOF "was pay-

ing its own agency under FIS instruments issued by the Company to that agency. The only funds changing hands were within the [GOF], and the funds invested in the Company through the FIS instruments remained in the Company." *Plaintiffs' Brief* at 17. Finally, Usinor notes that the companies "never made any payments under the repayment schedules." *Id.* (footnote omitted).

Usinor's arguments fail to establish that Commerce unreasonably determined the PACS and FIS instruments were debt. Undisputed record evidence demonstrates that Usinor Sacilor and its predecessors owed repayment obligations on the PACS and FIS instruments from the date of their issuance to the time of their conversion to common stock. *See Pub. Doc. 55, Confid. Doc. 3,* at 5; *id.,* Exs. 20A, 20B. Although the interest owed on the instruments was nominal and the companies' reimbursement obligations depended upon the companies' profitability, the fact remains that the companies were subject to liabilities on these instruments. *Cf. Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) (noting that under the bankruptcy code a party is subject to a "claim" or a "right to payment" whether or not such right is liquidated, unliquidated, fixed, *contingent,* matured, or unmatured). Because the companies faced such liabilities from the time the instruments originally issued, the court finds that Commerce had a reasonable basis upon which to determine that the instruments constituted debt upon issuance. In addition, because these liabilities lasted until the instruments' conversion, the contingent nature of the liabilities does not, as Usinor maintains, eviscerate Commerce's conclusion that the instruments were debt upon issuance. Accordingly, the court concludes that Commerce's determination that the PACS and FIS instruments were debt upon issuance is supported by substantial evidence on the record and is otherwise in accordance with law. This aspect of Commerce's *Final Determination* is therefore sustained.

### 2. *Usinor Sacilor's Equityworthiness in 1986 and 1988:*

■ The next issue before the court is whether Commerce's determination that Usi-

nor Sacilor and its predecessors were unequityworthy in 1986 and 1988 is supported by substantial evidence on the record and is otherwise in accordance with law. Commerce determined that the companies were unequityworthy from 1982 through 1988 because they reported substantial losses; their stockholders' equity was negative in every year except 1986; and, certain of the companies' financial indicators were negative prior to their restructuring in 1986. *Final Determination,* 58 Fed.Reg. at 6222. Commerce also concluded that "a prudent investor would not assess the reasonableness of investing in the newly restructured company without taking into consideration the tremendous financial difficulties of both companies prior to the restructurings or the reasons for those difficulties." *Id.*

Plaintiffs oppose Commerce's equityworthiness determination, claiming that Usinor and Sacilor were equityworthy by 1986. *Plaintiffs' Brief* at 7. As evidence of the companies' equityworthiness Usinor points to record evidence which, it maintains, shows the companies had cut costs and raised profits significantly by the time they reclassified their PACS and FIS instruments. *See id.* at 8–9. Usinor argues that the ITA ignored this evidence entirely and relied instead on the companies' financial performance in years prior to restructuring. *Id.* at 9. Moreover, Usinor faults Commerce for refusing to consider the companies' earnings before interest, taxes, and depreciation ("EBITD") as a measure of return on equity when record evidence showed that French investors relied upon EBITD in analyzing the equityworthiness of a company. *Id.* at 9 n. 32.

■ The court finds Usinor's position untenable. First, the guidelines that Commerce ordinarily considers in ascertaining whether a company is equityworthy militate against plaintiffs' suggestion that the ITA should have placed more reliance on Usinor's and Sacilor's prospective performance. These guidelines require Commerce to determine whether,

from the perspective of a reasonable private investor examining the firm at the time the government equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time. In making this determination, the Secretary *may* examine the following factors, *among others:*

(i) Current and *past indicators* of a firm's financial health calculated from that firm's statements and accounts, adjusted, if appropriate, to conform to generally accepted accounting principles;

(ii) *Future financial prospects* of the firm, including market studies, economic forecasts, and project or loan appraisals;

(iii) Rates of return on equity in the *three years prior* to the government equity infusion; and

(iv) Equity investment in the firm by private investors.

*Proposed Regulations,* 54 Fed.Reg. 23,366, 23,381 (May 31, 1989) (to be codified at 19 C.F.R. § 355.44(e)(2)(i)-(iv)) (emphasis added).[3] While Usinor does not challenge the reasonableness of the foregoing guidelines, it does assert that Commerce erred by not considering the companies' post-restructuring performance. The *Final Determination,* however, clearly indicates that Commerce did consider the firms' "future financial prospects" by analyzing a study of the firms prepared by McKinsey & Company. *See* 58 Fed.Reg. at 6222. In addition, to the extent that Usinor claims the ITA should have accorded the McKinsey study greater weight, the court finds such a claim without merit. The ITA's decision to place greater or less weight on the evidence presented to it is clearly within its discretion as the fact finder and does not undermine the reasonableness of its determination. *See Negev Phosphates, Ltd. v. United States Dep't of Commerce,* 12

CIT 1074, 1092, 699 F.Supp. 938, 953 (1988) ("This Court lacks authority to interfere with [the agency's] discretion as trier of fact to interpret reasonably evidence collected in [an] investigation." (citations omitted)).

Second, the *Proposed Regulations* also support Commerce's reliance on Usinor's and Sacilor's economic performance in the years prior to the 1986 restructuring. The guidelines contained in the *Proposed Regulations* expressly state that the agency may consider "past indicators of a firm's financial health" and, in the case of government infusions, "[r]ates of return on equity in the three years prior to the . . . infusion[s]." 54 Fed. Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(e)(2)(i), (iii)). Commerce's consideration of Usinor's and Sacilor's economic performance in the years prior to the 1986 restructuring is clearly in accordance with the foregoing language. Moreover, to the extent that Usinor contends that Commerce should have placed less emphasis on the companies' past economic performance, the court rejects this challenge to the ITA's discretion as trier of fact. *See Negev Phosphates,* 12 CIT at 1092, 699 F.Supp. at 953 (citations omitted).

Third, contrary to Usinor's suggestion, the fact that the companies had cut costs and raised profits significantly by the time they reclassified their PACS and FIS instruments does not demonstrate that Commerce's determination was unreasonable. *See Plaintiffs' Brief* at 8–9. The record in this case is replete with evidence which establishes that the companies were in a critical financial condition prior to and during the time of the 1986 and 1988 reclassifications, and supports a conclusion that the companies were unequityworthy. Thus, despite the fact that the evidence cited by Usinor could be interpreted to indicate that the companies experienced some recovery, the record contains substan-

---

**3.** The court does not consider the *Proposed Regulations* to be a codification of the ITA's practice. *British Steel PLC v. United States,* 879 F.Supp. 1254, 1295 n. 48 (CIT 1995). Instead, the court regards the *Proposed Regulations* "as merely published notice of [Commerce's] intent to codify those provisions." *Id.* Consequently, the court will assess whether the ITA has properly based its decision on the facts presented by this particular case. *See IPSCO, Inc. v. United States,* 12 CIT 359, 372, 687 F.Supp. 614, 626 (1988) ("*IP-SCO I*") (In the absence of a final regulation that it has promulgated, the "ITA must explain the basis for its decision based on the facts of [the] case."). Apart from those instances in which plaintiffs challenge a particular methodology embodied in the *Proposed Regulations,* the court will not scrutinize the validity of the methodologies. Instead, the court will ascertain whether Commerce properly applied the *Proposed Regulations* based on the record evidence in this case.

tial evidence supporting Commerce's determination that the companies were unequityworthy. *Cf. Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted).

■ Finally, the court finds that Commerce had a reasonable basis for not applying the return on equity methodology urged by Usinor. The EBITD methodology, which measures a company's return on equity based on the company's earnings before interest, taxes, and depreciation, is distinguishable from the methodology employed by Commerce which examines earnings *after* interest, taxes and depreciation. *See Final Determination,* 58 Fed.Reg. at 6222. Even assuming, as Usinor argues, that French investors rely on the EBITD measure in analyzing the equityworthiness of a company, under Commerce's *Proposed Regulations* the rate of return on equity is only one factor the ITA might consider. *See* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(e)(2)). Therefore, even if the EBITD measure were to show a positive return, the critical financial condition apparent from the totality of all of the factors that Commerce considered pursuant to the *Proposed Regulations* provides a reasonable basis for Commerce's determination.

Moreover, this court cannot discern any basis in the *Proposed Regulations* for limiting Commerce to measuring a firm's return on equity using the methodology ordinarily relied upon by investors in the country under investigation. Although the standard contained in the *Proposed Regulations* requires Commerce to examine a company from the perspective of a reasonable private investor,[4] the bases for measuring a company's return on equity are simply not limited to the methodologies ordinarily applied in the country under review. Rather, the ITA need only apply a methodology which reasonably effectuates the purpose of the statute under which it operates. *Ceramica Regiomontana,* 10

CIT at 405, 636 F.Supp. at 966 (citations omitted). In this investigation, Commerce declined to apply the EBITD methodology because "[w]hile potential investors may consider EBITD, it is not as accurate a reflection of the potential return on an investment as a measure which is net of interest, taxes, and depreciation, *i.e.,* net income." *Final Determination,* 58 Fed.Reg. at 6222. Usinor has not suggested any basis for finding Commerce's chosen methodology unreasonable other than the fact that French investors frequently apply the EBITD methodology. Plaintiffs' position clearly does not address the substance of the "net income" methodology that Commerce adopted. Because the court finds that the "net income" methodology provides a reasonable measure of the companies' return on equity, the court concludes that its application in this investigation is proper. For all of the foregoing reasons, the court holds that Commerce's determination that Usinor Sacilor and its predecessors were not equityworthy in 1986 and 1988 is supported by substantial evidence on the record and is otherwise in accordance with law. Accordingly, this aspect of Commerce's *Final Determination* is sustained.

### 3. *Valuation of Benefits from the Conversion of PACS and FIS Instruments:*

■ The next issue before the court is whether Commerce's determination, that the countervailable benefits arising from the conversion of PACS and FIS instruments equalled the face value of the remaining balance on the instruments, is supported by substantial evidence on the record and is otherwise in accordance with law. In its *Final Determination,* the ITA abandoned the rate of return shortfall ("RORS") methodology prescribed by the *Proposed Regulations* for measuring the benefit of equity investments in unequityworthy firms. *See Final Determination,* 58 Fed.Reg. at 6223. Under the RORS methodology, Commerce would

> measure[ ] the benefit of equity investments in "unequityworthy" firms by com-

---

**4.** 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(e)(2)).

paring the national average rate of return on equity with the company's rate of return on equity during each year of the allocation period. The difference in these amounts, the so-called rate of return shortfall (RORS), is then multiplied by the amount of the equity investment to determine the countervailable benefit in the given year.

*Id.; see also Proposed Regulations,* 54 Fed. Reg. at 23,385 (to be codified at 19 C.F.R. § 355.49(e)(1)). Under RORS, Commerce would also subtract from the amount of a firm's countervailable benefits any dividends paid during the year under examination that were not included in the firm's rate of return. *Proposed Regulations,* 54 Fed.Reg. at 23,385 (to be codified at 19 C.F.R. § 355.49(e)(1)). Commerce rejected the RORS methodology in the *Final Determination* because it found that the methodology does not accurately measure the benefit of government equity investments in unequityworthy firms. *Final Determination,* 58 Fed.Reg. at 6223. Specifically, Commerce concluded that an equity investment in an unequityworthy firm is tantamount to a grant and should be valued as such without any offset for subsequent dividends. *See id.* at 6229. Commerce explained:

> When [Commerce] finds that a company is unequityworthy and, hence, that the government's equity investment is inconsistent with commercial considerations, we are effectively finding that the company could not attract share capital from a reasonable investor. When a company is in such poor financial condition that it cannot attract capital, any capital it receives benefits the company as if it were a grant and no earnings of the company in subsequent years should be used to offset the benefit.

*Id.* at 6223. Commerce also determined that the RORS approach "is inadequate because it necessarily reflects the subsequent performance of the company." *Id.* at 6229. According to the ITA, "potential subsidies arise from the equity investment and not what happens to that equity subsequently." *Id.*

Usinor contends that the ITA erred in abandoning the RORS methodology. *Plaintiffs' Brief* at 10 n. 34. Usinor claims that

"[b]y equating an equity infusion into a supposedly unequityworthy company with a grant, the ITA has ignored the simple fact that, unlike receiving a grant, there is a cost to the firm of issuing equity, which is accurately measured by RORS." *Id.* Plaintiffs also assert that "[b]y treating equity infusions as grants, the ITA overvalue[d] the benefit to the firm" by failing to account for subsequent dividends. *Id.* at 10–11. Usinor maintains that the ITA should have valued the benefits using the present value of the forgiven obligations rather than their face value. *Id.* at 11. According to Usinor, because the 1986 and 1988 reclassifications effectively eliminated contingent obligations that were worthless due to the companies' unequityworthiness, the elimination conferred no countervailable benefits on the companies. *Id.* at 11–13.

Usinor's arguments fail to establish that Commerce's valuation methodology was improper in this case. First, the court rejects Usinor's argument that Commerce should have relied on the present value of the PACS and FIS instruments rather than on the face value of the instruments' remaining principal, because it ignores the fact that the PACS and FIS instruments constituted debt upon issuance which obligated the companies to make repayments once they became profitable. Usinor simply fails to acknowledge that the contingent nature of the liabilities does not affect the conclusion that the liabilities constituted debt. *Cf. Davenport,* 495 U.S. at 558, 110 S.Ct. at 2130. Although the PACS and FIS instruments clearly indicate that the companies' unprofitability might delay the companies' repayment obligation, such unprofitability does not *excuse* the obligations. Consequently, the extent to which the companies' unprofitability might have delayed repayment on the instruments is irrelevant to an analysis of whether and to what extent the instruments' conversions conferred countervailable benefits on the companies. The court concludes, therefore, that Commerce had a reasonable basis for determining that the countervailable benefits attributable to the conversion equal the face value of the remaining principal on the instruments. *See British Steel Corp. v. United States,* 10 CIT 224, 240, 632 F.Supp. 59, 71

(1986) ("[T]he commercial and competitive benefit of the subsidy to the recipient is the measure of the value of the subsidy. In the case of debt forgiveness, the commercial and competitive benefit to the recipient is debt extinguishment.").

Second, Usinor fails to establish that Commerce unreasonably focused upon the economic benefits inuring to the companies instead of on the value of the PACS and FIS instruments in the hands of the GOF. Because Commerce properly determined that the benefit of the subsidies attributable to the instruments' conversion equals the debt extinguished by the conversion, the court concludes that the ITA reasonably valued the subsidies in terms of the actual value realized by the companies from the debt forgiveness rather than the potential value foregone by the GOF.

Third, the court disagrees with Usinor's contention that Commerce's revised methodology overvalues the benefits of the investments made by the GOF, by not taking into account subsequent dividends paid by the companies to the GOF. Commerce had a reasonable basis for denying the companies an offset for such dividends because the dividends represented a return on the GOF's investment rather than a payback to the GOF for its investment. In other words, the dividends did not reduce the actual benefits the companies received from the instruments' conversion. Consequently, Commerce's methodology provides a reasonable measure of the actual commercial and competitive benefits attributable to the conversion of the PACS and FIS instruments. For all of the foregoing reasons the court concludes that Commerce's determination, that the countervailable benefits arising from the conversion of the PACS and FIS instruments equalled the face value of the remaining balance on the instruments, is supported by substantial evidence on the record and is otherwise in accordance with law. This aspect of Commerce's *Final Determination* is therefore sustained.

### 4. *Shareholder Advances as Non–Recurring Grants:*

■ The next issue before the court is whether Commerce's determination that shareholder advances made by the GOF to Usinor and Sacilor were non-recurring grants is supported by substantial evidence and is otherwise in accordance with law. At the outset, the court will address Inland Steel's threshold argument that the shareholders' advances were not grants upon issuance.

In its *Final Determination*, Commerce determined that the advances constitute countervailable grants at the time that they were received because no shares were distributed in return for these advances. *Final Determination*, 58 Fed.Reg. at 6225. Commerce treated the advances as grants as of the time of receipt because it found "no evidence showing that the parties contemplated that the shareholders' advances carried a repayment obligation." *Id.* at 6229. Commerce's verification report for the GOF states that GOF officials informed the ITA that [ ] *Confid. Doc. 19* at 8. Commerce's verification report for Usinor Sacilor further indicates that company officials [ ] *Confid. Doc. 20* at 9. Notwithstanding the fact that [ ] led Commerce to conclude that the grants were not "loans that were subsequently converted to equity or loans that were cancelled." *Final Determination*, 58 Fed. Reg. at 6229.

Inland Steel contends that the advances were clearly debt and, therefore, the question of whether the advances were recurring grants is irrelevant. *Defendant–Intervenor's Response Brief* at 18–19. Specifically, Inland Steel points to Usinor Sacilor's statement in its questionnaire response characterizing the advances as "loans" that are repayable on demand. *Id.* at 18 (quoting *Pub.Doc. 68, Confid.Doc. 6,* at 7). Inland Steel also relies on the fact that Usinor treated the advances as liabilities in its financial statements and tables compiled for Commerce. *Inland Steel's R.56.2 Brief* at 24 (citing *Pub.Doc. 68, Confid.Doc. 6,* Exs. H, M). Moreover, Inland Steel maintains that the advances could not have been equity when issued because they were converted into common stock in the 1986 restructuring. *Id.* at 24–25 (citing *Pub.Doc. 108, Confid.Doc. 20,* at 9–10; *Pub. Doc. 55, Confid.Doc. 3,* Ex. 27 at 2; *Pub.Doc.*

*107, Confid.Doc. 19,* at 9). Therefore, according to Inland Steel, it was unnecessary for Commerce to decide whether the advances were recurring. *Defendant–Intervenor's Response Brief* at 18–19.

The items of record cited by Inland Steel fail to establish that Commerce did not base its determination upon substantial evidence on the record. As noted, Commerce concluded that the advances were not loans upon issuance after determining that the record failed to show that the parties contemplated that these shareholders' advances carried a repayment obligation. The items upon which Inland Steel relies provide only some conflicting evidence of a repayment obligation.[5] *Compare Pub.Doc. 71,* Ex. M. at 10–11 (translated audited 1982 consolidated financial statement for Sacilor noting that the advances were "for the purpose of a subsequent capital increase") *with Pub.Doc. 68, Confid.Doc. 6,* at Ex. H (Usinor Sacilor group's condensed balance sheet [ ]). When record evidence gives rise to conflicting inferences, both of which are supported by substantial evidence, the decision as to the credibility of the evidence and the inference to be drawn therefrom lies with the fact finder. As fact finder in this case, the decision is well within the province of Commerce and this court will not disturb it. *See Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd after remand,* 8 Fed.Cir. (T) 29, 893 F.2d 337 (1990).

■ The court now turns to the question of whether the shareholders' advances were recurring. Under Commerce's past practice, the question of whether a particular program is recurring is relevant for purposes of deciding whether to allocate the benefit arising from the program's payments to the year of receipt or over time. *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada,* 50 Fed.Reg. 25,097, 25,101 (June 17, 1985) (final determination) (*"Live Swine"*) ("In the case of recurring programs, [Commerce] would allocate the benefit to the year of receipt; in non-recurring programs, [Commerce] would allocate the benefit over time." *Id.*).

Commerce generally considers three factors in determining whether a program confers recurring benefits. These factors are: (1) whether the program providing the benefit is exceptional; (2) whether the program is of long standing; and (3) whether there is any reason to believe that the program will not continue into the future. *Proposed Regulations,* 54 Fed.Reg. at 23,376 (citations omitted). In order to decide whether a program is "exceptional," the ITA will ascertain whether the program has been established for a period of years, or was designed as a "'one-time, shot-in-the-arm' subsidy program." *Live Swine,* 50 Fed.Reg. at 25,101.

In the instant investigation, Commerce examined the availability of the shareholders' advances. Specifically, the ITA noted that Usinor and Sacilor received the advances from the GOF from 1982 until 1986, at which time the GOF and the companies converted the advances to common stock. *Final Determination,* 58 Fed.Reg. at 6224. Commerce also indicated that the advances carried no interest and that the GOF did not place any preconditions on their receipt. *Id.* As noted, [ ] *Confid.Doc. 19* at 8. Commerce ultimately determined that the advances "should be treated as non-recurring grants."

---

5. The court finds most significant the fact that the probative value of the evidence cited by Inland Steel depends upon how the companies chose to characterize the advances in its questionnaire responses, financial statements, and tables prepared for Commerce. Because the evidence relates entirely to the manner in which the companies *characterized* the advances, such evidence neither establishes that the companies and the GOF agreed these advances would carry repayment obligations, nor does it preclude the conclusion that they did not agree such obligations would attach to the advances. In short, the items are merely probative of how the companies characterized the advances for financial accounting purposes and for this investigation. The evidence pertaining to the 1986 conversion is similarly unpersuasive because its probative value also depends upon the characterization of the advances rather than on an express agreement between the GOF and the companies. Consequently, even though the record items cited by Inland Steel may provide apparent support for finding there was a repayment obligation, the court concludes that such evidence does not so detract from the evidence relied upon by Commerce (in reaching the conclusion that the advances were grants upon issuance) that its determination is rendered unsupported by substantial evidence.

*Id.* at 6229. The ITA provided the following rationale for its determination:

> Although Usinor and Sacilor received shareholders' advances on a regular basis during the years 1982 through 1986, each advance required specific shareholders' approval. Moreover, these shareholders' advances were made to cover operating losses. Repeated shareholders' advances made to keep a company from dissolving are "exceptional" events, within the meaning of [*Live Swine,* 50 Fed.Reg. at 25,101]. Therefore, under the Department's methodology, we are treating the shareholders' advances as non-recurring.

*Id.* Commerce thus determined that the advances "constitute countervailable grants at the time they were received as no shares were distributed in return for these advances when they were made to Usinor and Sacilor." *Id.* at 6225. In accordance with its conclusion that the advances were non-recurring, Commerce allocated the advances over a 15–year period and did not allow the company to expense the advances in the year of receipt. *See id.* at 6230 (describing the 15–year allocation period which Commerce applied to the subsidies at issue).

Usinor contends that the advances were recurring grants under Commerce's usual methodology for testing grants. Specifically, Usinor claims that the advances "were not exceptional because they were provided repeatedly to cover losses regularly incurred." *Plaintiffs' Brief* at 18. Usinor also points to the fact that [ ]. *Id.* (quoting *Confid.Doc. 19* at 8). Plaintiffs further maintain that the advances "were longstanding, as they were provided for five consecutive years," and were likely to continue into the future due to the company's poor economic performance. *Id.* at 18–19. In light of these attributes, plaintiffs charge that Commerce had no basis for concluding the advances were non-recurring. *Id.* at 19–20.

Usinor's arguments fail to establish that Commerce did not base its determination upon substantial evidence on the record. Although the evidence cited by Usinor clearly indicates that the advances lasted for five years and, therefore, may have been longstanding, other record evidence amply supports Commerce's determination that the grants were exceptional. This evidence establishes that the GOF provided the advances on an essentially *ad hoc* basis, and was under no obligation to provide such advances. The *ad hoc* nature of the grants is apparent in the fact that provision of the grants depended upon the monthly losses realized by the companies and the approval of the Bureau Chief of the French Ministry of Treasury. *See Pub.Doc. 107, Confid.Doc. 19,* at 8; *cf. New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. 31,991, 31,996 (Aug. 3, 1989) (final determination) (Canadian government's provision of grants found to be exceptional in part because the government likely would have discontinued the grants if the recipient were to turn a profit). In sum, although the GOF may have provided the advances over a somewhat lengthy period of time, the conditions under which the companies received the advances provides a reasonable basis for concluding that the advances amounted to a series of "one-time, shot-in-the-arm" subsidies.

In addition, although the record contains conflicting evidence as to whether the GOF and the companies had an agreement pertaining to the advances,[6] to the extent such an agreement may have existed, it appears only to have created a mere *expectation* that the companies would receive the advances. *See Pub.Doc. 107, Confid.Doc. 19,* at 8 (indicating GOF officials told Commerce verifiers that the companies and the GOF had an agreement pursuant to which the companies [ ]). Despite the statements by the GOF which might support a different interpretation, the court finds that the totality of the record evidence reasonably supports the conclusion that the grants were exceptional. For the foregoing reasons, the court concludes that Commerce's determination that

---

6. *Compare* Verification Report for Usinor Sacilor, *Pub.Doc. 108, Confid.Doc. 20,* at 9 (indicating that the GOF and the companies had no official agreement regarding stockholders' advances) *with* Verification Report for the GOF, *Pub.Doc. 107, Confid.Doc. 19,* at 8 (noting GOF officials told Commerce verifiers that the companies and the GOF had an agreement pursuant to which [ ]).

shareholder advances made by the GOF to Usinor and Sacilor were non-recurring grants is supported by substantial evidence and is otherwise in accordance with law. This aspect of Commerce's *Final Determination* is therefore sustained.

5. *FDES Consolidated Loans and Outstanding CFDI Loans Conferred Countervailable Benefits:*

The next issue before the court is whether Commerce's determination that the consolidation of Usinor Sacilor's FDES loans conferred a countervailable benefit upon the company, as did outstanding CFDI loans during the period of investigation, is supported by substantial evidence and is otherwise in accordance with law. As noted, beginning in approximately 1978, Usinor, Sacilor, or their subsidiaries obtained "participative" FDES and CFDI loans. These loans carried below market interest rates and required borrowers to pay a share of future profits. *Final Determination*, 58 Fed.Reg. at 6225. In 1990, the outstanding principal on FDES loans to Usinor and Sacilor was consolidated into multiple long-term loans. *Id.* In 1991, outstanding CFDI loans to Usinor Sacilor were similarly consolidated. *Id.*

Commerce determined that the consolidated FDES loans were countervailable after concluding that the loans were *de facto* limited. *Id.* The ITA reached this conclusion upon finding that the information submitted to it pertaining to the availability of the consolidated loans was deficient. Specifically, Commerce states that the GOF

provided the total distribution of participative FDES loans for 1981 through 1990. It does not appear that the new 1990, consolidated loans for Usinor Sacilor are included in this information. The information provided only seems to relate to participative loans rather than the types of loans obtained by Usinor Sacilor in 1990. Indeed, the information provided indicates that the consolidated amounts exceeded the total amount of FDES loans distributed to all sectors of the economy for the years 1987, 1988, and 1989 combined.

*Id.* Because it lacked information as to whether the loans were limited to a specific enterprise or industry or group of enterprises or industries, Commerce concluded that the loans were *de facto* limited. *Id.*

Commerce's determination with respect to the CFDI loans differed. First, the ITA determined that consolidation of the CFDI loans produced no cash flow effect during the period of investigation and, therefore, did not provide any countervailable benefits during that time. *Final Determination*, 58 Fed. Reg. at 6225. In contrast to the consolidated CFDI loans, however, Commerce did find that Usinor Sacilor's old CFDI loans created a potentially countervailable cash flow effect during the POI. *Id.* After determining that such a cash flow effect existed, the ITA considered whether the CFDI loans were limited to a specific enterprise and, therefore, countervailable. Commerce determined that the CFDI loans were *de facto* limited to a specific enterprise because the evidence adduced by plaintiffs failed to demonstrate that the loans were non-specific. *Id.* As a result, Commerce concluded that the CFDI loans are *de facto* limited and "are countervailable to the extent that they were provided on terms inconsistent with commercial considerations." *Id.*

The specificity inquiry that Commerce undertook in the instant investigation arises from 19 U.S.C. § 1677(5). This statutory provision directs Commerce, in considering whether a domestic subsidy exists, to "determine whether the ... subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries." 19 U.S.C. § 1677(5)(B) (1988). This provision also indicates that "[n]ominal general availability, under the terms of the law, regulation, program, or rule establishing a ... subsidy, of the benefits thereunder is not a basis for determining that the ... subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof." *Id.* This standard "focuses on the *de facto* case-by-case effect of benefits provided to recipients rather than on the nominal availability of benefits." *Cabot Corp. v. United States*, 9 CIT 489, 498, 620 F.Supp. 722, 732 (1985), *appeal dismissed*, 4 Fed.Cir. (T) 80, 788 F.2d 1539 (1986).

■ Usinor challenges Commerce's specificity determinations concerning the GOF's provision of the old CFDI loans and the consolidated FDES loans. With respect to the consolidated FDES loans, Usinor argues that the ITA erroneously found these loans to be *de facto* specific because the consolidation did not materially alter the terms of the original loans. *Plaintiffs' Brief* at 21–22. In support, Usinor states that "the ITA verified that the terms of the consolidated loans were designed to match, on average, the maturity and interest rates on the original loans." *Id.* at 21. According to plaintiffs, because "the consolidation did not materially alter the terms of the original loans, the only reasonable method of determining whether the FDES loans were *de facto* specific would have been to compare the amounts of the loans originally granted to Usinor Sacilor with those contemporaneously granted to other sectors of the French economy." *Id.* at 21–22 (footnote omitted). Such a comparison, contend plaintiffs, "demonstrates that the loans to Usinor Sacilor were not *de facto* specific, as they comprised a small fraction of the loans granted to other sectors of the economy." *Id.* (footnote omitted). Plaintiffs also argue that Commerce's specificity determination must fail because Commerce improperly compared the availability of consolidated FDES loans with the availability of the original FDES loans. *Plaintiffs' Reply Brief* at 12.

Upon review, the court finds Usinor's arguments unavailing. Usinor's assertions, while ultimately attacking the validity of Commerce's specificity determination, target the ITA's assumption that the consolidated loans were new loans that *may* constitute countervailable subsidies. *See Confid.Doc. 16* at 9 ( [ ] ). By arguing that this assumption is invalid, Usinor effectively shifts the focus away from Commerce's specificity determination and toward the more fundamental question of whether a subsidy *could have* arisen by virtue of the consolidation.

Simply put, the record in this case belies Usinor's position. It is clear that the terms of the consolidated FDES loans differ from the terms of the original FDES loans. *See,*

*e.g., Confid.Doc. 6* at 6 ( [ ] ); *see also id.,* Ex. D at 1 (noting that the original loans were [ ] ). Furthermore, although Commerce's verification report indicates that GOF officials stated that the consolidated loans had terms *designed* to match those of the original loans, this does not demonstrate such matching *actually* occurred. Neither GOF officials nor Usinor sought to demonstrate through calculations or otherwise that the terms of the consolidated loans actually matched those of the original loans. Thus, even assuming that the matching of terms was intended, such an assumption does not negate Commerce's conclusion that the consolidated loans did in fact have new terms and, therefore, should be regarded as new loans. Accordingly, the court rejects plaintiffs' argument that the consolidated FDES loans did not contain new terms, and finds that Commerce's determination that the consolidated loans could have conferred subsidies upon Usinor Sacilor is reasonable and is supported by substantial record evidence. This aspect of Commerce's *Final Determination* is therefore sustained.

■ The court finds Usinor's challenge to Commerce's specificity determination equally without merit. Usinor premises its challenge on a misapprehension of the facts. In short, Usinor claims that Commerce should have addressed only the availability of the original FDES loans because, in its view, the 1990 consolidated loans were not new loans and, consequently, could not have conferred any countervailable subsidy. *See Plaintiffs' Brief* at 21–22. As noted, however, the record in this case supports Commerce's conclusion that the 1990 consolidated loans were new loans. Thus, because the 1990 consolidated loans formed the basis of Commerce's FDES inquiry, Commerce properly considered data relating to the consolidated loans, including data pertaining to the availability of such loans. As a result, the court concludes that plaintiffs have failed to demonstrate that Commerce's determination that the consolidated FDES loans were specific and, therefore, countervailable, is unsupported by substantial evidence on the record or not otherwise in accordance with law. Accordingly, this aspect of Commerce's *Final Determination* is sustained.

With regard to the old CFDI loans, Usinor contends that the record clearly establishes that these loans were not *de facto* specific. *Plaintiffs' Brief* at 22. Specifically, plaintiffs point to a letter written by the president of CFDI which indicates that the CFDI loans were not limited to a specific enterprise or industry or group of enterprises or industries. *Id.* (citing *Confid.Doc. 20,* Ex. 31). Plaintiffs maintain that this letter amply demonstrates that the loans were not *de facto* specific, and thus precludes the conclusion reached by Commerce that Usinor failed to provide adequate evidence to establish the character of the loans. *Id.* Plaintiffs also fault Commerce for assuming that the CFDI loans were *de facto* specific based on Usinor Sacilor's failure to provide additional evidence demonstrating that the loans were generally available. *Id.*

Upon review, the court finds plaintiffs' arguments unavailing. In their submissions to this court, plaintiffs cite two items on the record in support of their position. The first item is a listing of outstanding CFDI loans transferred to Usinor Sacilor. *Pub.Doc. 68, Confid.Doc. 6,* Ex. D at 36. This listing, however, simply does not indicate whether CFDI loans were generally available throughout the French economy.

The second item, a letter from the president of CFDI to plaintiffs' former counsel, is equally uninstructive. The pertinent translated portion of this letter reads: [ ] *Confid.Doc. 20,* Ex. 31. The general nature of this lone statement clearly renders it an inadequate basis for determining whether the CFDI loans were non-specific. Indeed, the letter is devoid of any factual support for plaintiffs' assertion that the CFDI loans were generally available and, therefore, non-specific. Accordingly, the court finds that Commerce reasonably concluded that this letter failed to substantiate Usinor's position regarding the availability of the CFDI loans. For the foregoing reasons, the court rejects plaintiffs' claim that Commerce was provided with evidence which demonstrated that the loans were generally available and, therefore, non-specific. The same reasons also compel the court to find that plaintiffs have failed to establish that Commerce improperly assumed the CFDI loans were *de facto* specific.

Finally, the court finds plaintiffs' claim, that Commerce lacked substantial evidence for its determination, similarly without merit. In the instant investigation, Commerce noted that plaintiffs failed to submit information "on the terms of [Usinor Sacilor's old CFDI loans] or whether these loans were limited to a specific enterprise or industry or group of enterprises or industries." *Preliminary Determination,* 57 Fed.Reg. at 42,979. In the absence of such information, Commerce determined it would apply best information available ("BIA").[7] *Id.* Similarly, in the *Final Determination,* Commerce determined that the CFDI loans were *de facto* specific based on a lack of supporting evidence from plaintiffs regarding the availability of the loans. *Final Determination,* 58 Fed.Reg. at 6225. It is apparent from both the *Preliminary Determination* and the *Final Determination* that Commerce sought but did not receive information bearing on the availability of the old CFDI loans and that the absence of such information prompted the ITA to conclude these loans were *de facto* specific.

 While it is unclear whether Commerce intended to reaffirm its reliance on BIA in the *Final Determination,* the rationale underlying the BIA rule unquestionably supports Commerce's CFDI determination. BIA is a rule of adverse inference which allows Commerce to avoid "rewarding the uncooperative and recalcitrant party for its failure to supply requested information." *Allied–Signal Aerospace Co. v. United States,* 11 Fed.Cir. (T) ——, ——, 996 F.2d 1185, 1192 (1993). This rule exists in recognition of the fact that "the ITA cannot be left merely to the largesse of the parties at their discretion to supply the ITA with information. . . . Otherwise, alleged unfair traders would be able to control the amount of . . . duties by selectively providing the ITA with information." *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) 69, 76, 899 F.2d 1565, 1571–72 (1990) (citations omitted). Commerce's application of the rule "fairly places the burden of production on the im-

---

**7.** Commerce's authority to apply BIA derives from 19 U.S.C. § 1677e(c) (1988).

porter, which has in its possession the information capable of rebutting the agency's inference." *Rhone Poulenc, Inc. v. United States,* 8 Fed.Cir. (T) 61, 67, 899 F.2d 1185, 1190–91 (1990).

In this case, plaintiffs failed to provide Commerce with sufficient information pertaining to the availability of the old CFDI loans. The language of the *Preliminary Determination* clearly placed plaintiffs on notice of the need to submit information in this regard. *Preliminary Determination,* 57 Fed.Reg. at 42,979. Rather than argue no such information existed, plaintiffs responded by submitting the items previously discussed, i.e. the listing of CFDI loans and the letter from the CFDI president. These items, however, could not reasonably be expected to satisfy the submission deficiency that Commerce identified in the *Preliminary Determination.* Because plaintiffs failed to provide Commerce with information that was materially probative of whether the old CFDI loans were industry non-specific, when plaintiffs were in the best position to do so, the ITA had a reasonable basis for inferring that such information would have demonstrated that the loans were *de facto* specific. *Cf. Rhone Poulenc,* 8 Fed.Cir. (T) at 67, 899 F.2d at 1190 (the ITA's presumption that the highest prior dumping margin was the best information of current margins "reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the [BIA] rule, would have produced *current* information showing the margin to be less"). As a result, the court concludes that Commerce's determination that the old CFDI loans were *de facto* specific and, therefore, countervailable, is supported by substantial evidence on the record and otherwise in accordance with law. Accordingly, this aspect of Commerce's *Final Determination* is sustained.

6. *The IMF Long–Term Rate for France as the Benchmark Interest and Discount Rate:*

■ The next issue before the court is whether Commerce's determination to use the IMF's long-term rate for France as the benchmark interest and discount rate in the years in which Usinor Sacilor was uncreditworthy is supported by substantial evidence and is otherwise in accordance with law. Commerce decided to use the IMF rate as the benchmark interest and discount rate and added a risk premium to measure the benefits the company received from the GOF's grant programs because the company "did not report its actual cost for long-term, fixed-rate debt." *Final Determination,* 58 Fed.Reg. at 6224. The ITA determined that it would apply the highest annual interest rate published by the IMF pursuant to its *Proposed Regulations* and based on its finding that Usinor Sacilor was uncreditworthy in the years in which the GOF approved all of the company's grants. *Id.; see Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)).

Commerce's *Proposed Regulations* describe the manner in which the ITA generally measures countervailable benefits arising from governmental loans and grants. These regulations indicate that "[a] loan provided by a government confers a countervailable benefit to the extent that the amount paid by a firm for the government loan is less than what the firm would pay for a benchmark loan." *Proposed Regulations,* 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(b)(1)). For government long-term loans,[8] the benchmark prescribed by the regulations varies depending upon whether the company under investigation is creditworthy. Proposed § 355.44(b)(4) sets forth the benchmark rates for creditworthy companies while proposed § 355.44(b)(6)(iv) describes the rates for uncreditworthy companies. *See id.,* 54 Fed.Reg. at 23,380–81. The latter provision requires Commerce, in relevant part, to "calculate the benchmark interest rate for a long-term government loan by taking the sum of 12 percent of the prime interest rate in the country in question and ... [t]he highest long-term fixed interest rate commonly available to firms in the country in

***

8. A long-term loan means a loan, the terms of repayment for which are greater than one year.

*Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.41(j)).

question." *Id.* at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)).

Once Commerce determines the amount of countervailable benefits flowing from a government loan, the ITA then allocates the benefits over time and, specifically, to the period of investigation. The methodology that Commerce will employ for allocating long-term government loans appears in proposed 19 C.F.R. § 355.49(c)(1). *See id.,* 54 Fed.Reg. at 23,384–85. Specifically, Commerce will use the following three-step process:

(i) Determine the grant equivalent for the loan by calculating the present value, in the year the loan is received, of the difference between the amount that the firm is to pay under the government loan and the amount that the firm would have paid under the benchmark loan;

(ii) Assign a discount rate; and

(iii) Construct a benefit stream.

*Proposed Regulations,* 54 Fed.Reg. at 23,385. The discount rate that Commerce will assign under the second step of the allocation process is "the benchmark interest rate for the loan in question determined pursuant to § 355.44(b)." *Id.* Because the ITA selected the IMF long-term rate for France as the benchmark interest rate pursuant to § 355.44(b)(6)(iv), the IMF rate became the discount rate assigned under § 355.49(c)(1), (c)(3).

The *Proposed Regulations* prescribe similar treatment for government grants; Commerce will measure the countervailable benefits from the grants and allocate a portion of the benefits to the period of investigation. With respect to measuring the amount of countervailable benefits attributable to such grants, the regulations provide that "a countervailable benefit exists in the amount of the grant." *Id.,* 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(a)). In addition, the allocation that Commerce will undertake for grants entails virtually the same three-step process as that for loans. Specifically, the ITA will: (1) determine the amount of the countervailable benefit pursuant to § 355.44; (2) assign a discount rate; and (3) construct a benefit stream. *Id.,* 54 Fed.Reg.

at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(1)(i)–(iii)).

The methodology that the *Proposed Regulations* prescribe for assigning discount rates to governmental grants diverges, however, from that provided for governmental loans. Instead of using the benchmark interest rate as the discount rate, as is the case with governmental loans, the *Proposed Regulations* set forth the following three options from which Commerce may assign a discount rate, in order of preference:

(i) The cost of long-term, fixed-rate debt of the firm in question, excluding loans found to confer a countervailable subsidy;

(ii) The average cost of long-term, fixed-rate debt in the country in question; or

(iii) A rate which the Secretary considers to be most appropriate.

*Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(2)(i)–(iii)). Notwithstanding this hierarchy, in numerous investigations Commerce has used the benchmark interest rate as the discount rate where the company under review was *uncreditworthy* at the time when the government approved or provided the grants. *See, e.g., Certain Steel Products From France,* 58 Fed.Reg. 37,304, 37,313–14 (July 9, 1993) (final determination); *Certain Steel Products From Spain,* 58 Fed.Reg. 37,374, 37,384–85 (July 9, 1993) (final determination); *New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. at 31,994 (final determination); *Certain Carbon Steel Products From Brazil,* 52 Fed.Reg. 829, 831 (Jan. 9, 1987) (final results of admin. review). Consistent with its practice in the aforementioned investigations, Commerce used the IMF long-term rate for France as the discount rate for Usinor Sacilor's grants in the years in which the company was uncreditworthy. *Final Determination,* 58 Fed.Reg. at 6224.

Plaintiffs oppose Commerce's determination for several reasons. Plaintiffs assert that the benchmark interest and discount rate adopted by Commerce were punitive and mark a departure from the agency's past practice. *See Plaintiffs' Brief* at 23–24. Specifically, plaintiffs fault Commerce for adding a risk premium to the discount rate used to allocate the benefits of the grants

that Usinor Sacilor received. *Id.* at 23 n. 83. Plaintiffs also suggest that the ITA improperly ignored information submitted by both petitioners and plaintiffs pertaining to the applicability of lower, OECD interest rates. *Id.* at 23–24. Finally, as a factual matter, Usinor claims the ITA erroneously determined that the IMF rate was a long-term lending rate as record evidence establishes that this rate applied to short-term and medium-term financing. *Id.* at 24.

The court finds plaintiffs' arguments unavailing. To the extent that plaintiffs contend the discount rate assigned in the instant case is punitive, plaintiffs place undue reliance on the fact that the *Proposed Regulations* do not provide for a risk premium for discount rates. *See Proposed Regulations,* 54 Fed. Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(2)(i)–(iii)). As noted, Commerce developed its practice of assigning discount rates that match the benchmark interest rates for uncreditworthy companies both before and after publication of the *Proposed Regulations. See Certain Steel Products From France,* 58 Fed.Reg. at 37,313–14 (1993 determination using the benchmark interest rate as the discount rate); *Certain Steel Products From Spain,* 58 Fed.Reg. at 37,384–85 (1993 determination using the benchmark interest rate as the discount rate); *New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. at 31,994 (1989 determination using the benchmark interest rate as the discount rate); *Certain Carbon Steel Products From Brazil,* 52 Fed.Reg. at 831 (1987 determination using the benchmark interest rate as the discount rate).

The addition of a risk premium to the benchmark rate conforms Commerce's methodology for assigning discount rates for grants to its methodology for assigning discount rates for loans. *See Proposed Regulations,* 54 Fed.Reg. at 23,381 (indicating Commerce will calculate the benchmark rate for a government long-term loan "by taking the sum of 12 percent of the prime interest rate in the country in question and ... [t]he highest long-term fixed interest rate commonly available to firms in the country in question") (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)); *id.,* 54 Fed.Reg. at 23,385 (the discount rate for allocating the benefits from a governmental loan is "the benchmark interest rate for the loan in question determined pursuant to § 355.44(b)") (to be codified at 19 C.F.R. § 355.49(c)(3)). If Commerce did not add a risk premium to the "highest long-term fixed interest rate" in assigning a discount rate for government grants, the uncreditworthy recipient company would completely avoid the additional "12 percent of the prime interest rate" that Commerce would have applied if the company were to have received a governmental loan. Commerce's practice of using the "highest long-term fixed interest rate" in addition to a risk premium is reasonable because it creates uniformity in the ITA's treatment of government loans and grants and allocates benefits in a manner that better corresponds to commercial reality than does a creditworthy discount rate or a rate that does not contain a risk premium. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471–72 (emphasizing the need to develop reasonable methods of allocating subsidies received over time in a manner that reflects the subsidies' commercial and competitive benefit to the recipient). While it is unclear from the record how the risk premium added to the IMF rate for the grants' discount rates compares with the additional "12 percent of the prime interest rate" that Commerce ordinarily adds to the benchmark rate for purposes of assigning a discount rate for government loans, the risk premium clearly enables the ITA to treat grants and loans more similarly. For the foregoing reasons, the court concludes that the ITA has a reasonable basis for using the benchmark interest rates for uncreditworthy companies, plus a risk premium, as the discount rates for such companies. The reasonableness of Commerce's methodology, coupled with the fact that Usinor Sacilor was uncreditworthy at the time when the GOF approved the grants at issue, convince the court that the discount rate that Commerce assigned to Usinor Sacilor was not punitive.

The court also rejects plaintiffs' argument that Commerce's addition of a risk premium to the discount rate represents a departure from past practice. As noted, in at least two prior unrelated investigations, Commerce

added a risk premium to the applicable interest rate in calculating the discount rate which the ITA used to allocate countervailable benefits over time. *New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. at 31,993–94; *Certain Carbon Steel Products From Brazil,* 52 Fed.Reg. at 831. These investigations also compel the conclusion that Commerce has not limited its use of a risk premium to instances in which the particular subsidy at issue is a loan. The court, therefore, disagrees with plaintiffs' suggestion that Commerce's determination to use a risk premium in this case is a "novel practice."

■ Plaintiffs' claim that Commerce should have used the OECD rates is similarly without merit. Plaintiffs base their claim on the fact that both petitioners and plaintiffs submitted these rates to Commerce in the instant investigation, and that Commerce used these rates in prior investigations involving merchandise from France. Notwithstanding the fact that both petitioners and plaintiffs submitted OECD rates to Commerce, the IMF rates are clearly a matter of public record and Commerce adequately explained its reliance upon the IMF rates in the instant case. *Cf. Ipsco, Inc. v. United States,* 12 CIT 1128, 1130, 701 F.Supp. 236, 238 (1988) ("If ITA wishes to apply information gleaned from public documents it may do so, as long as it relates such information to the facts of the case before it."). In addition, the *Preliminary Determination* demonstrates that information pertaining to IMF rates was before the ITA and that plaintiffs had an opportunity to raise whatever objections they may have had to the ITA's use of such rates. *Preliminary Determination,* 57 Fed.Reg. at 42,978 (noting Commerce's use of the IMF rates in the instant investigation). Consequently, the fact that both petitioners and plaintiffs submitted OECD rates to Commerce does not establish that Commerce improperly applied the IMF rates.

Plaintiffs' reliance on Commerce's earlier investigations of French companies is also misplaced. Whereas the companies under review in those previous cases were creditworthy in the years for which Commerce applied the OECD rates, Usinor Sacilor was

uncreditworthy in the years for which the agency has applied the IMF rates in this case. The former investigations cited by plaintiffs, therefore, do not demonstrate the unreasonableness of Commerce's application of the higher IMF rates in this case. The court also observes that the *Proposed Regulations,* promulgated approximately seven years after the investigations cited by plaintiffs, expressly indicate that Commerce will use "[t]he highest long-term fixed interest rate commonly available to firms in the country in question" to calculate the benchmark interest rate for uncreditworthy firms. 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(b)(6)(iv)(A)(1)). Commerce's current practice accords with this approach. *Certain Steel Products From France,* 58 Fed.Reg. at 37,313–14; *Certain Steel Products From Spain,* 58 Fed.Reg. at 37,384–85; *New Steel Rail, Except Light Rail, From Canada,* 54 Fed.Reg. at 31,994. For all of the foregoing reasons, the court finds that the earlier investigations upon which plaintiffs rely do not mandate the use of the lower OECD rates in this case.

■ Finally, the court also rejects plaintiffs' claim that the IMF rates are not long-term rates. To demonstrate that the IMF rates are not long-term rates, plaintiffs point to a passage in the International Financial Statistics Yearbook ("Yearbook") published by the IMF which indicates that the lending rates at issue " 'meet the short- and medium-term financing needs of the private sector.' " *Plaintiffs' Brief* at 24 (citation omitted). The foregoing passage is not probative of whether the IMF rates do not apply to loans that, under Commerce's definition, are long-term. As noted, Commerce uses the term "long-term loan" to describe loans, "the terms of repayment for which are greater than one year." *Proposed Regulations,* 54 Fed.Reg. at 23,379 (to be codified at 19 C.F.R. § 355.41(j)). Nothing in the passage cited by plaintiffs clarifies the meaning of the terms used and, specifically, whether the IMF rates apply to loans the terms of repayment of which are *less than* one year. Consequently, the court concludes that the Yearbook does not demonstrate Commerce improperly regarded the IMF rates as long-term rates.

Plaintiffs' second argument is similarly unavailing. According to plaintiffs, "a simple comparison of the IMF lending rates to the OECD rates ... makes it obvious that the IMF rate was far closer to the rates charged to individuals for short-term loans and to businesses for overdrafts and advances than to medium- and long-term rates charged to businesses." *Plaintiffs' Brief* at 24 (footnote omitted). The comparison urged by plaintiffs simply does not demonstrate that Commerce erroneously relied on the IMF rate as a long-term rate. The mere fact that the IMF rates may correspond to what the OECD has determined to be the rates for individuals' short-term loans and for businesses' overdrafts and advances does not establish that the IMF rates are inapplicable to long-term loans as defined by Commerce's *Proposed Regulations.* The inference derived from the comparison urged by plaintiffs, i.e. that the higher IMF rates are not long-term rates for businesses, is premised upon the definitions used by, and the accuracy of, the OECD. However, plaintiffs have not directed the court to any record evidence identifying the duration of the loans underlying the OECD rates. Nothing in the OECD tables defines the terms short-term, medium-term, and long-term. *See Pub.Doc. 55, Confid.Doc. 3,* Ex. 38. The meanings of these terms as employed by the OECD are thus unclear on the record. In addition, as suggested by Inland Steel, it would appear that "the [OECD] rates are merely reference rates from which lending institutions derive their final financing terms." *Defendant–Intervenor's Response Brief* at 29. During verification, French bank officials informed Commerce that banks will "add a few percentage points to the [OECD] rate to determine the final lending rate." *Pub.Doc. 107, Confid.Doc. 19,* at 15–16. The accuracy of the OECD rates cited by plaintiffs, therefore, is also uncertain. As a result, although the comparison advanced by plaintiffs may indicate a disparity between the OECD and IMF rates, such a disparity does not establish that Commerce lacked substantial evidence on the record for concluding that the IMF rate was a long-term rate. For all of the foregoing reasons, the court concludes that Commerce's determination to use the IMF's long-term rate as the benchmark interest and discount rate in the years in which Usinor Sacilor was uncreditworthy is supported by substantial evidence and is otherwise in accordance with law. Accordingly, the court sustains this aspect of Commerce's *Final Determination.*

### 7. *15–Year Amortization Period:*

■ The next issue before the court is whether Commerce's determination to use a 15–year amortization period for allocating the countervailable benefits resulting from the non-recurring grants and equity infusions that Usinor Sacilor received is supported by substantial evidence and is otherwise in accordance with law. Commerce based this determination on its finding that the 15–year period reflects "the average useful life of assets in the steel industry." *Final Determination,* 58 Fed.Reg. at 6223–24 (citing *Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(3))). The proposed regulation cited by Commerce states that the agency will use "the average useful life of a firm's renewable physical assets (equipment), as set forth in the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System" ("IRS Tables") as one component in the calculation of the recipient firm's benefit stream. *Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(b)(3)). The benefit stream, in turn, is one aspect that Commerce considers in allocating grants and equity infusions over time. *See id.*

The ITA's arbitrary reliance upon the IRS Tables has previously been addressed and rejected by this Court. *See, e.g., British Steel PLC v. United States,* 879 F.Supp. 1254, 1293–99 (CIT 1995). The *British Steel* court observed that "[t]he legislative history of the Trade Agreements Act of 1979 clearly sets forth Congress' intent with respect to allocating benefits of subsidies over time." *Id.,* 879 F.Supp. at 1294. In particular, the legislative history emphasizes that "a reasonable [allocation] period *based on the commercial and competitive benefit to the recipient* as a result of the subsidy must be used." S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), reprinted in 1979 U.S.C.C.A.N. 381,

471–72 (emphasis added); *see also British Steel Corp. v. United States,* 10 CIT 224, 236, 632 F.Supp. 59, 68 (1986) (Commerce must allocate subsidy benefits over a period of time reflecting the commercial and competitive benefit of the subsidy to the recipient).

▮▮▮▮ The record in this case compels the court to conclude that Commerce improperly settled upon a 15–year amortization period to calculate the benefit stream attributable to the non-recurring grants and equity infusions that Usinor Sacilor received from the GOF.[9] To begin, the court rejects defendant's argument that this court should uphold Commerce's determination to use a 15–year amortization period because the period "reasonably reflects economic reality for Usinor Sacilor." *Defendant's Brief* at 76 (citation omitted). It is axiomatic that "[p]ost-hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis for sustaining the agency's determination." *U.H.F.C. Co. v. United States,* 9 Fed.Cir. (T) 1, 13, 916 F.2d 689, 700 (1990) (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Nothing on the record in this case shows that Commerce considered the "economic reality for Usinor Sacilor" in arriving at its decision to use a 15–year amortization period.

To the contrary, the record discloses that Commerce simply adhered to its past practice of using the IRS Tables to derive an amortization period. *See, e.g., Final Determination,* 58 Fed.Reg. at 6223–25 (summarily noting the ITA's reliance upon the average useful life of assets in the steel industry as set forth in the IRS Tables to determine the amortization period for Usinor's grants and equity infusions). Commerce's exclusive reliance on the IRS Tables also appears in its response to plaintiffs' and petitioners' comments on the amortization issue:

> While the Department has indicated its willingness to consider a ten-year allocation period generally ... nothing that the

parties have argued leads us to conclude that we should depart from the 15–year standard for this investigation. Therefore, we have continued to use the 15–year allocation period based on the 1977 IRS depreciation table, as amended in 1985, covering renewable assets for steel.

*Id.,* 58 Fed.Reg. at 6230. The *Final Determination* unequivocally demonstrates that Commerce invoked the amortization methodology set forth in the *Proposed Regulations,* which in turn is based upon the IRS Tables rather than on the actual economic experience of the recipient company. Although the record indicates that Usinor Sacilor furnished Commerce with information pertaining to the useful life of its assets, nothing on the record suggests that the ITA relied on this information in making its allocation determination. *See Pub.Doc. 108, Confid.Doc. 20,* at 25–26. Indeed, the record reflects that Commerce made no attempt to assess the extent to which the 15–year useful life period prescribed by the IRS Tables actually reflects the commercial and competitive benefits accruing to Usinor Sacilor as a result of the non-recurring grants and equity infusions.

Consequently, because Commerce failed to base its decision to employ a 15–year amortization period on the actual commercial and competitive benefits of the subsidies to Usinor Sacilor, the court cannot sustain Commerce's determination as to this issue; defendant's post-hoc rationalization that the useful life set forth in the IRS Tables coincides with the company's "economic reality" is simply unavailing. For the foregoing reasons, the court finds that the amortization methodology employed by Commerce in this case is unsupported by substantial evidence on the record and otherwise not in accordance with law. The court therefore remands this issue to Commerce.

Upon remand, Commerce is directed to identify what record evidence, if any, demonstrates that the amortization methodology

---

9. Because Commerce has not yet promulgated final regulations with regard to its amortization methodology, the court does not consider the ITA's use of the IRS Tables in the instant case to be the application of a firm rule. Accordingly, the court must assess the evidentiary basis supporting Commerce's decision to use the IRS Tables in this case. *See British Steel,* 879 F.Supp. 1254, 1295 n. 48 (CIT 1995).

employed in this case reasonably reflects the commercial and competitive benefits of the subsidies provided to Usinor Sacilor. Should Commerce determine that its amortization methodology does not reasonably reflect the commercial and competitive benefits of the subsidies provided to Usinor Sacilor, Commerce is directed to amend its determination accordingly.[10] The court emphasizes that, in remanding this issue, it does not seek to afford Commerce an opportunity to rearticulate non-record reasons for using the 15–year amortization period, or to supply the court with post-hoc rationalizations for why the IRS Tables reasonably reflect Usinor's economic experience. Rather, the court's sole purpose is to determine whether substantial record evidence exists to support Commerce's choice of a 15–year amortization period in this case, and, if not, to provide Commerce with an opportunity to employ an appropriate amortization methodology in its stead.

8. *The Exclusion of Usinor Sacilor's Non–French Production from the Sales Denominator:*

■ The next issue before the court is whether Commerce's determination to exclude sales of the company's non-French produced merchandise from the sales denominator used in computing Usinor Sacilor's net subsidy is supported by substantial evidence and is otherwise in accordance with law. In analyzing this issue, the court will first review Commerce's decision to employ a "tied" analysis. The court will then turn to an examination of whether Commerce's implementation of that methodology may be sustained in this case.

The computation of a firm's net subsidy requires the ITA to divide: (1) the benefits attributable to subsidies received by the firm, less any offsets, by: (2) sales of the firm's products which benefit from such subsidies. *See Proposed Regulations,* 54 Fed.Reg. at 23,383–84 (to be codified at 19 C.F.R. § 355.47). The sales reflected in the denominator will vary depending upon whether Commerce determines the countervailable benefits at issue are "tied" to particular products marketed by the firm under investigation.[11] Specifically, if the ITA finds that a countervailable benefit is tied to the production or sale of a particular product or products, it will allocate the benefit solely to that product or products. *Proposed Regulations,* 54 Fed.Reg. at 23,383 (to be codified at 19 C.F.R. § 355.47(a)). In such circumstances, the sales denominator will contain the "firm's total sales of the product or products to which the benefit is tied." *Id.,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.47(a)(1)). Where, however, Commerce determines that countervailable benefits are "not tied to the production or sale of a particular product or products, ... the Secretary will allocate the benefit to all products produced by a firm." *Id.* (to be codified at 19 C.F.R. § 355.47(c)(1)). To effect the allocation for untied benefits, the sales denominator consists of the "firm's total sales." *Id.* (to be codified at 19 C.F.R. § 355.47(c)(1)(i)).

In this case, Commerce was faced with a respondent whose total sales included sales of both domestically produced merchandise as well as merchandise produced in other countries. Commerce first determined that the subsidies were tied to domestic production because the GOF specifically bestowed the subsidies "to benefit domestic production." *Final Determination,* 58 Fed.Reg. at 6230–31 (citation omitted). The ITA reached this determination "after reviewing the pro-

---

10. It is not the function of this court to prescribe to Commerce the particular allocation methodology it should employ on remand; the law requires only that the methodology applied be reasonable and conform to Congress' intent. *See Ceramica Regiomontana,* 10 CIT at 404–05, 636 F.Supp. at 966.

11. A "tied" benefit ordinarily refers to countervailable benefits that a government bestows specifically for the purchase of costly pieces of capital equipment, *see, e.g., Certain Steel Products*

*From Belgium,* Appendix 2, 47 Fed.Reg. 39,304, 39,316 (Sept. 7, 1982) (final determination), or to promote the production or sale (i.e. export sales) of a particular product. *See Proposed Regulations,* 54 Fed.Reg. at 23,374–75. In the present case, the ITA treated the equity and other capital infusions paid to Usinor Sacilor as being "tied" to Usinor's French production only, and therefore allocated the benefits over Usinor's French sales rather than over its consolidated worldwide sales.

grams from which the subsidies at issue arose[;] ... considering the GOF''s contemporaneous controlling ownership position in Usinor Sacilor[;] [and concluding that] the GOF was seeking to promote domestic social policy and domestic economic activities and therefore to encourage domestic production." *Id.*, 58 Fed.Reg. at 6231. Commerce therefore allocated Usinor's countervailable benefits "fully to domestic production." *Id.*

Plaintiffs challenge Commerce's determination to exclude Usinor Sacilor's non-French sales from the sales denominator on several grounds. First, plaintiffs argue that Commerce's methodology in this case represents an abrupt departure from its long-standing practice of treating equity infusions as untied benefits and allocating them over a firm's total sales, based upon the principle that money is fungible and that a subsidy, regardless of the underlying intent or its actual use, frees up money for other purposes and thus provides a general benefit to the firm. Commerce responds by arguing that this investigation presented an issue that previously had not been directly addressed, i.e. determining the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries. Commerce argues that the *Proposed Regulations* do not squarely address this issue, *see Final Determination*, 58 Fed.Reg. at 6230, and that its rejection of the fungibility approach is reasonable based upon the record in this case. Usinor replies that the *Proposed Regulations* do not include an exception for firms with multinational production, but rather provide generally that equity infusions are to be treated as untied benefits which are to be allocated to all products produced by a firm. *Proposed Regulations*, 54 Fed.Reg. at 23,375, 23,383–84 (to be codified at 19 C.F.R. § 355.47(c)(1), (c)(2)).

■ The court begins by noting that ordinarily an agency may revise its interpretation of the statutory requirements it enforces and enjoy deference from the courts. *Rust v. Sullivan*, 500 U.S. 173, 186, 111 S.Ct. 1759, 1768, 114 L.Ed.2d 233 (1991). Such deference, however, is predicated on a finding that the agency revised its interpretation with a "reasoned analysis." *See id.* at 187, 111 S.Ct. at 1769 (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)). Plaintiffs' claim, that the ITA had a long-standing practice of treating equity infusions as untied benefits and allocating them over a firm's total sales, is undermined by the fact that in at least one prior investigation Commerce did in fact exclude a firm's sales of non-domestically produced merchandise from the sales denominator.[12] In any event, the court finds that Commerce has articulated a reasoned basis for analyzing this issue via a "tying" inquiry. Commerce is presumably in the best position to determine whether an issue has been addressed by *Proposed Regulations* which the agency itself promulgated. Although the *Proposed Regulations* provide that Commerce will treat equity infusions as untied benefits, the language employed clearly permits the conclusion that the *Proposed Regulations* do not speak directly to the issue of allocating the benefits of countervailable equity infusions across sales for a respondent with multinational production. *See Proposed Regulations*, 54 Fed.Reg. at 23,-383–84 (to be codified at 19 C.F.R. § 355.47). Commerce's reading of proposed 19 C.F.R. § 355.47(c) thus appears reasonable. Furthermore, to the extent that Commerce's methodology does represent a departure from past practice, the court finds that Commerce's decision to engage in a "tying" inquiry was based upon reasoned analysis. *See Final Determination*, 58 Fed.Reg. at 6230 (rejecting either of the extremes posited by petitioners and respondents). This aspect of Commerce's *Final Determination* is therefore sustained.[13]

---

**12.** *Final Determination*, 58 Fed.Reg. at 6230 (citing *Stainless Steel Hollow Products from Sweden*, 52 Fed.Reg. 5794 (Feb. 26, 1987) (final determination)). Commerce failed to articulate the basis for this aspect of its determination. *See Stainless* *Steel Hollow Products from Sweden*, 52 Fed.Reg. at 5796 (analysis of programs).

**13.** The court notes that, in a subsequent investigation, Commerce refined the "tied" analysis it

■ The court now turns to consider whether Commerce properly implemented its tied analysis in this case. Commerce indicates that it first undertook a factual inquiry to determine whether the subsidies at issue were tied to domestic production. After concluding that they were, Commerce then allocated the benefits of these tied subsidies to sales of the tied merchandise, i.e. domestic production. Commerce determined that the subsidies at issue were tied to Usinor's French production based upon: (1) protocols between the GOF, the French steel companies and their creditors, which were designed to make the French steel industry internationally competitive and to get it back into shape so that it could then develop normally using normal resources;[14] (2) press statements made by French President Mitterand in 1984 addressing, among other issues, the problems created by the steel industry crisis to the "workers who live it, to the regions where they live, and to the entire country" and identifying specific regions in France particularly affected by the crisis;[15] (3) cabinet meeting minutes from 1984 which reflect discussion of the government's restructuring plans for the steel industry and which reference the modernization, construction, consolidation, and reindustrialization efforts undertaken in specific towns and regions in France;[16] (4) the McKinsey study discussing the planned restructuring of the French steel industry and, with respect to Unimétal, generally calling for various plant closings, plant modernization or expansion, and labor reductions;[17] and (5) the GOF's contemporaneous controlling ownership position in Usinor Sacilor.[18] *Defendant's Brief* at 29–32.

■ The foregoing items unquestionably provide a reasonable basis upon which to conclude that the GOF intended to aid the French steel industry. The court notes, however, that "the countervailing duty law concerns itself not with the government's purpose or intent in a particular program, but whether the government's funds give the country's exports an unfair competitive advantage." *British Steel Corp. v. United States*, 9 CIT 85, 95, 605 F.Supp. 286, 294 (citing *G.S. Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903)). This principle flows from the premise that "it is the economic result of the foreign government's action which controls." *United States v. Zenith Radio Corp.*, 64 C.C.P.A. 130, 138–39, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). In addition, the legislative history to the Tariff Act of 1979 reflects Congress' intent that Commerce ascertain which products are likely to have benefited from countervailable

employed in this case. Specifically, in the *General Issues Appendix* appended to *Certain Steel Products from Austria*, 58 Fed.Reg. 37,217, 37,-225 (July 9, 1993) (final determination), Commerce stated that:

> [U]nder [Commerce's] refined "tied" analysis, [Commerce] will begin by presuming that a subsidy provided by the government of the country under investigation is tied to domestic production. However, this presumption is not irrebuttable. A party may rebut this presumption by presenting evidence tending to show that the subsidy was not tied to domestic production.

*Id.* at 37,231. Commerce's refined "tied" analysis was challenged in *British Steel PLC v. United States*, 879 F.Supp. 1254, 1309–20 (CIT 1995). In remanding the matter, the *British Steel* court held that Commerce failed to afford respondents in that consolidated action an opportunity to comment upon Commerce's adoption of a rebuttable presumption that subsidies are tied to domestic production, and that Commerce failed to afford respondents an opportunity to submit evidence to rebut the presumption erected by the agency. *British Steel*, 879 F.Supp. at 1317. In contrast to the presumption employed in *British Steel*, Commerce's instant determination (i.e. that the equity infusions Usinor received were tied to French production), was based solely upon the record compiled as a result of its investigation in this particular case. Having sustained Commerce's decision to employ its "unrefined" tied analysis in this case, the court need address only whether Commerce's implementation of that analysis is supported by substantial evidence and in accordance with law. For the reasons that follow, the court concludes that it is not.

14. *Pub.Doc. 1*, Ex. 7 at 1; *Confid.Doc. 3*, Ex. 5 at 1.

15. *Confid.Doc. 3*, Ex. 2 at 2, 6.

16. *Confid.Doc. 3*, Ex. 25 at 1.

17. *Confid.Doc. 3*, Ex. 27 at 1–2; *id.*, Ex. 28 at 2–7.

18. *Final Determination*, 58 Fed.Reg. at 6231.

subsidies in determining how it will allocate the value of such subsidies. *See* S.Rep. No. 249 at 85, *reprinted in* 1979 U.S.C.C.A.N. at 471 ("Reasonable methods of allocating the value of . . . subsidies over the production or exportation of the products benefitting from the subsidy must be used."); H.R.Rep. No. 317, 96th Cong. 1st Sess. 75 (1979) ("[I]n calculating the *ad valorem* effect of non-recurring subsidy grants or loans, reasonable methods of allocating the value of such subsidies over the production or exportation of products benefitting from them will be used."). Thus, Commerce's traditional "tied" analysis entailed an assessment of the *likely* effect of a countervailable subsidy; this analysis did not, however, require Commerce to determine the *actual* effect of a subsidy, either during the period of investigation or at any time after the subsidy's bestowal. *See Industrial Nitrocellulose from France,* 52 Fed.Reg. 833, 834–35 (Jan. 9, 1987) (final results of admin. review).

■■■ Plaintiffs stress that the critical issue in determining whether a subsidy is tied or untied is not the breadth of the recipient's operations, but whether the subsidy's nature and effects were to benefit a specific part of those operations. *Plaintiffs' Brief* at 32. Commerce maintains that it retained its traditional approach in the tied analysis it employed in the instant case, i.e. allocating the benefits inuring to Usinor based upon its determination of the likely effect of the subsidies bestowed. Plaintiffs, however, challenge Commerce's consideration of the GOF's intent in bestowing the subsidies at issue. Commerce responds by arguing that the GOF's intent is simply one of several relevant criteria to be considered in making this determination. *Defendant's Brief* at 85–86. Although the court agrees that clear evidence of an intent on the part of the subsidizing government to benefit only domestic industry, coupled with evidence of that government's controlling ownership interest in the subsidized firm, may, *inter alia,* provide a reasonable basis for concluding that the subsidy at issue is likely to be tied to the firm's domestic production because the subsidizing government is in a position to effectuate its intent, the court finds that in this case Commerce reached its conclusion

based upon a record rendered incomplete due to procedural unfairness on the part of the agency.

Plaintiffs submit that Commerce failed to conduct a proper investigation into whether the subsidies at issue were tied to domestic production. *Plaintiffs' Brief* at 44–45. Specifically, plaintiffs claim that Commerce did not request any information relating to the likely effect of the subsidies at issue and that the failure to request such information demonstrates the ITA conducted an inadequate investigation. *Id.* at 45. Commerce disputes plaintiffs' claim that it never sought information on the "tied" issue. According to defendant, Commerce asked Usinor Sacilor numerous questions pertaining to the subsidy programs which "sought broad and detailed information." *Defendant's Brief* at 88. Although Commerce never employed the term "tied" in any of its questions, defendant argues that the broad scope of the questions contemplated any matters that might have some bearing on the "tied" issue. *Id.*

Upon review, the court finds that Commerce failed to notify plaintiffs that it lacked the information necessary to assess the likely effects of the GOF's subsidies. Significantly, in its *Preliminary Determination,* Commerce allocated the subsidies at issue over Usinor's worldwide sales; furthermore, the record is devoid of subsequent information requests on the part of Commerce pertaining to the likely effects of the GOF subsidies, either at the hearing or at verification. On the facts of this case, Commerce's failure to provide plaintiffs with notice pertaining to the absence of information that would have allowed the ITA to ascertain the likely effects of the GOF's subsidy programs deprived plaintiffs of their right to participate in the investigation below, and renders Commerce's determination unsupported by substantial evidence and otherwise contrary to law. *See Creswell Trading Co., Inc. v. United States,* 13 Fed.Cir. (T) ——, ——, 15 F.3d 1054, 1062 (1994) ("Commerce is presumably in the best position to know what it means by its own requirements and what evidence will satisfy these requirements."). The fact that Commerce might have sought broad and detailed information pertaining to the subsidy

programs, as defendant claims, does not discharge the ITA from its obligation to put parties on notice as to the deficiencies in their responses. Commerce's failure either to advise the parties of the deficiencies in their submissions or to indicate its inability to ascertain the likely effects of the GOF's subsidy programs in the *Preliminary Determination* or elsewhere compels the conclusion that the ITA's "tied" determination was procedurally unfair. *See Creswell Trading Co.,* 13 Fed.Cir. (T) at ——, 15 F.3d at 1062. As a result, the court finds that remand is warranted in order to afford Commerce the opportunity to reopen the record to redress this deficiency in its investigation.

In sum, the court has reviewed the various arguments raised by the parties pertaining to Commerce's exclusion of non-French sales from the sales denominator, and finds that Commerce's decision to employ a "tied" analysis is supported by substantial evidence on the record and in accordance with law. The court also finds, however, that Commerce failed to apprise respondents of this issue, and failed to afford respondents an opportunity to present evidence tending to show that the likely benefits of the subsidies were not tied to domestic production. For the foregoing reasons, the court remands this issue to Commerce with instructions that it reopen the record in this case to afford plaintiffs an opportunity to present evidence, if any, tending to show that the subsidies at issue were not tied to domestic production. Commerce shall then review the entirety of the record, as amended, and render its determination accordingly.

### B. *Inland Steel v. United States.*

#### 1. *Usinor Sacilor's Equityworthiness in 1991:*

■ The first issue presented in *Inland Steel v. United States* is whether Commerce's determination that Usinor Sacilor was equityworthy in 1991 is supported by substantial evidence and is otherwise in accordance with law. Although Commerce preliminarily determined that Usinor Sacilor was unequityworthy in 1991, the ITA revised its position in the *Final Determination* after concluding that the firm "was capable of

generating a reasonable rate of return within a reasonable period of time." *Final Determination,* 58 Fed.Reg. at 6232. Commerce based its determination on two separate items: a comprehensive evaluation of the company performed by Crédit Lyonnais, and a report prepared by an independent Swiss consulting firm on behalf of the EC ("SFS Report"). *See id.*

Inland Steel challenges this aspect of Commerce's *Final Determination* on various grounds. First, Inland Steel argues that Commerce improperly based "its decision entirely on a single unsubstantiated report performed by a consulting firm on behalf of the EC," and that by relying on the SFS Report, Commerce abandoned its normal practice of "mak[ing] findings on the basis of feasibility studies only when the enterprise being investigated had no operational history to examine." *Inland Steel's R.56.2 Brief* at 13–14 (footnote and emphasis omitted). The court disagrees. As noted, the *Proposed Regulations* set forth Commerce's existing practice as of the time the agency published notice of the regulations. *See Proposed Regulations,* 54 Fed.Reg. at 23,366 ("These regulations codify much of the Department's existing practice with respect to the identification and measurement of subsidies under the [countervailing duty] law."). The practice described in the *Proposed Regulations* for examining a firm's equityworthiness indicates that the ITA will determine whether,

from the perspective of a reasonable private investor examining the firm at the time the government equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time. In making this determination, the Secretary *may* examine the following factors, *among others:*

(i) Current and past indicators of a firm's financial health calculated from that firm's statements and accounts, adjusted, if appropriate, to conform to generally accepted accounting principles;

(ii) Future financial prospects of the firm, including market studies, economic forecasts, and project or loan appraisals;

(iii) Rates of return on equity in the three years prior to the government equity infusion; and

(iv) Equity investment in the firm by private investors.

*Proposed Regulations,* 54 Fed.Reg. at 23,381 (to be codified at 19 C.F.R. § 355.44(e)(2)(i)–(iv)) (emphasis added). The plain language of the *Proposed Regulations* unequivocally demonstrates that the factors enumerated are non-exclusive. It is thus clear that Commerce's practice, as reflected in the foregoing guidelines, does not preclude consideration of a report such as the one prepared by Société Fiduciaire Suisse. Furthermore, the SFS Report is clearly probative of the "[f]uture financial prospects of the firm" and, as such, is reasonably within the guidelines' express provisions. *Id.* (to be codified at 19 C.F.R. § 355.44(e)(2)(ii)). Finally, to the extent Inland Steel relies on investigations that Commerce undertook approximately four and five years before publishing notice of the *Proposed Regulations,* the court does not find these investigations probative of the ITA's "normal practice."

▮ Second, Inland Steel argues that the ITA failed to explain adequately its reasons for reversing its preliminary determination that Usinor Sacilor was not equityworthy in 1991. *Inland Steel's R.56.2 Brief* at 20–21 (citations omitted). The court finds this argument without merit. In contrast to the reversal addressed in *Ad Hoc Comm. of AZ–NM–TX–FL v. United States,* 16 CIT 115, 117–18, 787 F.Supp. 208, 211 (1992) ("*Ad Hoc*"), the ITA supplied a reasoned basis for changing its preliminary determination in the instant case. *Cf. Ad Hoc,* 16 CIT at 117, 787 F.Supp. at 211 (ordering a remand because the ITA supplied *no explanation* as to why it reversed its preliminary determination on a level of trade issue). It is readily apparent from the *Final Determination* that Commerce's reversal stemmed from the fact that the ITA obtained a complete copy of the SFS Report only after it had published notice of the *Preliminary Determination* and, based on its review of the complete report, determined that Usinor Sacilor "was capable of generating a reasonable rate of return within

a reasonable period of time." *Final Determination,* 58 Fed.Reg. at 6223, 6232. The ITA thus set forth the basis for its departure from its preliminary determination. Accordingly, the court rejects Inland Steel's assertion that Commerce failed to explain adequately why it reversed its preliminary determination as to this issue.

▮ Third, Inland Steel contends that Commerce abandoned its traditional standard for measuring equityworthiness. *Inland Steel's R.56.2 Brief* at 14–17. Specifically, Inland Steel maintains that under its usual standard, Commerce should have concluded that Usinor Sacilor was not equityworthy because the firm's 1991 operating profit was nearly a third of its profit two years earlier, and resulted in "an overall net loss for the year of FF 3.1 billion." *Id.* at 15 (citing *Pub.Doc. 117, Confid.Doc. 23,* at Ex. 2). Inland Steel notes that certain financial data for Usinor Sacilor were worse in 1991 than in 1988 and 1989, years in which the ITA deemed the company uncreditworthy and unequityworthy, respectively. *Id.* at 17. In addition, Inland Steel argues that the measures that Commerce ordinarily applies to assess a company's economic health, such as rate of return on assets and equity, quick ratio, and debt-to-equity ratio, all indicate that Usinor Sacilor was in poor financial condition. *Id.* at 15–16 (citing *Pub.Doc. 117, Confid.Doc. 23,* at Ex. 2). Inland Steel also asserts that the record is replete with evidence demonstrating that the economic forecast for the French steel industry as a whole in 1991 was extremely pessimistic, as was that for Usinor Sacilor individually. *Id.* at 16 (citations omitted).

The court finds Inland Steel's position untenable. The crux of Inland Steel's argument is that Commerce misinterpreted the evidence before it. As noted, however, this court will not reweigh record evidence or second guess the conclusions reached by Commerce so long as substantial evidence on the record supports the ITA's conclusions. The following record evidence convinces the court that the ITA based its determination on substantial evidence: (1) [ ];[19] (2)

---

19. *Confid.Doc. 6,* Ex. H; *Confid.Doc. 21* at 10.

[　　]; [20] (3) [　　]; [21] (4) [　　]; [22] (5) [　　]; [23] and (6) Crédit Lyonnais, which purchased a 20 percent interest in the company in 1991, concluded that its investment would produce a reasonable return.[24] The foregoing evidence, which appears both in the SFS Report and elsewhere on the record, clearly provides a reasonable basis upon which to conclude that Usinor Sacilor was equityworthy in 1991. The mere fact that Inland Steel can point to conflicting record evidence does not so detract from the evidence relied upon by Commerce that the agency's determination is unsupported by substantial evidence on the record. *See Consolo,* 383 U.S. at 620.

Finally, Inland Steel contends that the SFS Report upon which Commerce relied in making its equityworthiness determination is defective. *Id.* at 17–20. First, Inland Steel maintains the SFS Report is biased in favor of Usinor Sacilor. *Id.* at 17–18. Second, Inland Steel asserts that the consulting firm did not prepare the report from the perspective of a reasonable private investor and, therefore, did not meet the standard that Commerce ordinarily applies. *Id.* at 18–19. Third, Inland Steel argues that the financial data included in the report simply do not support Commerce's conclusion that Usinor Sacilor would have attracted investment from a reasonable private investor in 1991. *Id.* at 19.

The court finds that Inland Steel has failed to establish that the SFS Report is defective. With regard to Inland Steel's claim that the SFS Report is biased in favor of Usinor Sacilor, Inland Steel has pointed to nothing on the record that substantiates such a claim. Instead, Inland Steel relies on [　　]. *Inland Steel's R.56.2 Brief* at 18 n. 42. With regard to Inland Steel's assertion that the SFS Report is inadequate because it does not apply the reasonable private investor standard, the court finds that the record is re-

plete with evidence that demonstrates the report did in fact employ such a standard. *See Confid.Doc. 21* at 1–2; *id.* at 9 ([　　]). Finally, the court finds that Inland Steel's contention, that the financial data contained in the SFS Report do not support Commerce's determination, must also fail, as it would require this court to reweigh the evidence presented to Commerce—a task that this court will not undertake because, as noted, the record in this case provides substantial evidence for Commerce's conclusion. For all of the foregoing reasons, the court concludes that Commerce's determination that Usinor Sacilor was equityworthy in 1991 is supported by substantial evidence on the record and is otherwise in accordance with law. Accordingly, this aspect of Commerce's *Final Determination* is sustained.

### 2. *Characterization of Shareholder Advances as Grants:*

The next issue raised by Inland Steel is whether Commerce's determination that the shareholder advances received by Usinor Sacilor were grants is supported by substantial evidence and is otherwise in accordance with law. The court has already discussed this issue in part II.A.4 of this opinion. For all of the reasons previously noted, the court concludes that Commerce's determination that the shareholder advances were grants is supported by substantial evidence and is otherwise in accordance with law. Accordingly, this aspect of Commerce's *Final Determination* is sustained.

### 3. *Crédit National Loan Consolidation:*

▮ The final issue raised by Inland Steel is whether Commerce's determination that Crédit National loans were not specific to the steel industry is supported by substantial evidence and is otherwise in accordance

20. *Confid.Doc. 6,* Ex. C. at 13.

21. *Confid.Doc. 6,* Ex. C. at 12.

22. *Confid.Doc. 21* at 10.

23. *Confid.Doc. 21* at 13–14.

24. *Final Determination,* 58 Fed.Reg. at 6232; *Preliminary Determination,* 57 Fed.Reg. at 42,-

979. Commerce also noted that Crédit Lyonnais reached its conclusion after "evaluat[ing] its potential return from [its] investment [in Usinor Sacilor] by considering its overall return in the form of profits, dividends, additional leverage, and increased banking fees." *Final Determination,* 58 Fed.Reg. at 6232.

with law. As noted, Commerce treated the 1991 Crédit National loan consolidations as new loans "because they carried new terms and conditions." *Final Determination,* 58 Fed.Reg. at 6226. In its *Preliminary Determination,* Commerce found that although the consolidated Crédit National loans could not have conferred subsidies during the POI because they had no cash flow effect during that time, the old loans which were outstanding during the POI could have conferred a countervailable benefit. *See Preliminary Determination,* 57 Fed.Reg. at 42,979. Commerce further stated that because

> [n]o information was submitted on the terms of these "old loans" or whether these loans were limited to a specific enterprise or industry or group of enterprises or industries[,] ... we are applying [BIA].
>
> To calculate the benefit arising from these loans during the POI, we have assumed that no interest was paid and have compared this to the rate from the OECD Financial Statistics publication "Typical Short-term Interest Rates" as our benchmark rate. On this basis, we calculated an estimated net subsidy rate of 0.67 percent *ad valorem* for "old" Crédit National ... loans.

*Id.* In its *Final Determination,* however, Commerce made no mention of the specificity of the old Crédit National loans; instead, Commerce examined only the distribution of Crédit National loans issued in 1991, in order to determine whether Usinor's consolidated Crédit National loans were specific. *See Final Determination* at 6226–27; *Defendant's Brief* at 60. After examining Crédit National's *Annual Report* for 1991, Commerce found that the institution provided loans to numerous sectors of the French economy and did not make a disproportionate amount of loans to the steel industry. *Final Determination,* 58 Fed.Reg. at 6227. Commerce also verified that an independent committee composed of experts from various industries evaluates loan applications and, using neutral criteria, makes recommendations to Crédit National with respect to their viability. *Id.* Based upon this process of independent evaluation and the information provided in Crédit National's *Annual Report* for 1991, Com-

merce determined that "the consolidated 1991 loans from Crédit National were not provided to a specific enterprise or industry or group of enterprises or industries, and, therefore, are not countervailable." *Id.* Significantly, it appears that Commerce applied the results of this specificity inquiry to the old Crédit National loans and the consolidated Crédit National loans alike. *See Defendant's Brief* at 62 n. 95.

Inland Steel opposes Commerce's determination on two separate grounds. First, Inland Steel argues that Commerce erred by "basing its *de facto* specificity determination on an unsubstantiated lending breakdown found in Crédit National's 1991 *Annual Report.*" *Inland Steel's R.56.2 Brief* at 30 (citation omitted). Inland Steel maintains that this lending breakdown cannot alone support Commerce's specificity determination because Crédit National administers loans for numerous governmental and parastatal organizations and, as a result, the loan table may be overly broad and reflect lending pursuant to other government programs, apart from steel programs. *Id.* at 31. Inland Steel charges that Commerce never confirmed whether the consolidated loans to Usinor Sacilor were included in lending figures for the chemicals, energy and metals sector; Inland Steel therefore considers Commerce's reliance upon this data to be unreasonable. *Id.* at 31–32. Finally, Inland Steel asserts that Commerce erred by failing to compare the terms of Usinor Sacilor's consolidated loans with those provided to other Crédit National borrowers. *Id.* at 32.

The court finds Inland Steel's various arguments unavailing. In short, nothing on the record in this case suggests that the data contained in the 1991 *Annual Report* are inaccurate or otherwise unreliable. Instead of directing the court to record evidence that demonstrates deficiencies in the *Annual Report's* figures, Inland Steel merely characterizes the information as "unsubstantiated" and potentially "overly broad." Because Inland Steel has failed to substantiate its contentions with record evidence which detracts substantially from the credibility of the information underlying Commerce's determination, this court will not second-guess Com-

merce's investigation and assessment of the evidence presented on the record. *See Timken Co.*, 12 CIT at 962, 699 F.Supp. at 306.

The court also rejects Inland Steel's contention that Commerce erred by not comparing the terms of Usinor Sacilor's consolidated loans with loans provided by Crédit National to other borrowers. The absence of a comparison between the terms of Usinor Sacilor's consolidated loans and loans made to other of Crédit National's borrowers does not establish that Commerce's determination was unsupported. The material contained in the Crédit National *Annual Report* and other information submitted by plaintiffs provided Commerce with a reasonable basis upon which to determine that the 1991 consolidated loans were not *de facto* specific and, therefore, not countervailable. *See Pub.Doc. 107, Confid.Doc. 19*, at 11–13 (indicating Crédit National officials provided Commerce's verifiers with information concerning the provision of loans to industry and interest rate calculations). In sum, the court concludes that Commerce's determination that the consolidated Crédit National loans were not specific to the steel industry is supported by substantial evidence and is otherwise in accordance with law. Consequently, the court sustains this aspect of Commerce's *Final Determination.*

■ Second, Inland Steel argues that Commerce focused upon the wrong program by examining the specificity of Crédit National loans in 1991, the year of consolidation, rather than the years in which the original loans were issued. Inland Steel maintains that because Commerce preliminarily found that the outstanding loans could have conferred a countervailable benefit, Commerce should have examined the pattern of lending by Crédit National at the time that these original loans were issued. *Inland Steel's R.56.2 Brief* at 29. In response, the defendant merely states that "Commerce's specificity discussion reflects an assumption that . . . it was proper to analyze loan distribution at the time of the consolidation, 1991." *Defendant's Brief* at 62 n. 95.

The court finds that Commerce has failed to articulate a reasonable explanation for

why it assessed the specificity of the government loans in question, i.e. those Crédit National loans that were outstanding in 1991 (prior to their consolidation), by analyzing loan distribution in 1991, the year of consolidation, rather than the years in which the original loans were issued. *See Defendant's Brief* at 60–62. Commerce has also failed to articulate the reasons for its departure from the specificity determination rendered in its *Preliminary Determination.* Upon review, the propriety of Commerce's underlying assumption is not readily apparent to the court. For the foregoing reasons, the court finds that Commerce's determination that the old Crédit National loans were not specific to the steel industry is unsupported by substantial evidence on the record. The court therefore remands this issue in order to afford Commerce an opportunity to reexamine its methodology. Should Commerce decide that, with regard to the specificity of the old Crédit National loans, it is proper to analyze loan distribution at the time of the consolidation, Commerce must clearly articulate the reasoning which supports such a methodology. If, however, it should find fault with this methodology, Commerce shall amend its determination accordingly, reopening the record if necessary in order to render a decision supported by substantial evidence.

### III. CONCLUSION

Upon consideration of all of the parties' arguments and submissions, the court holds that the following aspects of Commerce's *Final Determination* are supported by substantial evidence on the record and are otherwise in accordance with law: (1) the PACS and FIS instruments received by Usinor and Sacilor were debt upon issuance; (2) Usinor Sacilor and its predecessors were not equity-worthy in 1986 and 1988; (3) the countervailable benefits inuring to Usinor Sacilor and its predecessors as a result of the conversion of the PACS and FIS instruments to common stock equalled the face value of the remaining principal on the instruments; (4) shareholder advances made by the GOF to Usinor and Sacilor were non-recurring grants; (5) Usinor Sacilor's consolidated FDES loans, as well as its old CFDI loans (prior to consolida-

tion), conferred countervailable benefits upon the company; (6) the benchmark discount and interest rate in the years in which Usinor Sacilor was uncreditworthy is the IMF's long-term rate for France; (7) identification of the sales benefitting from the subsidies at issue warranted a "tied" analysis; (8) Usinor Sacilor was equityworthy in 1991; and (9) the consolidated Crédit National loans were not specific to the steel industry.

The court further holds that the following aspects of Commerce's *Final Determination* are not supported by substantial evidence on the record and are not otherwise in accordance with law: (1) the amortization period for the non-recurring grants and equity infusions that Usinor Sacilor received is 15 years; (2) the sales denominator used in computing Usinor Sacilor's net subsidy must exclude sales of the company's non-French produced merchandise; and (3) the old Crédit National loans were not specific to the steel industry. The court remands this action to Commerce with instructions that Commerce address the deficiencies identified herein. The court's order shall enter accordingly.